## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD DALTON AND LORIS DALTON, h/w<br>and<br>ERIC DALTON AND SANDI DALTON, h/w<br><br>v.<br><br>McCOURT ELECTRIC LLC<br>and<br>INTERMATIC, INC.<br><br>v.<br><br>DELTRAN CORP.<br><br>v.<br><br>THYSSEN KRUPP MATERIALS NA and<br>COPPER & BRASS SALES, INC. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:   CIVIL ACTION<br>:<br>:   NO. 12-3568<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## ORDER

Now this, _____ day of _____, 2014, upon consideration of the

*Daubert* Motion of Defendant, Intermatic, Inc., to Preclude Plaintiffs' Liability Expert, Michael

Wald, and any response thereto, it is hereby **ORDERED** and **DECREED** that plaintiffs'

Liability Expert, Michael Wald, is precluded from offering testimony at a trial of this matter.




**BY THE COURT:**


_____
                                   J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD DALTON AND LORIS DALTON, h/w | : | CIVIL ACTION |
| and | : | |
| ERIC DALTON AND SANDI DALTON, h/w | : | NO.  12-3568 |
| | : | |
| v. | : | |
| | : | |
| McCOURT ELECTRIC LLC | : | |
| and | : | |
| INTERMATIC, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| DELTRAN CORP. | : | |
| | : | |
| v. | : | |
| | : | |
| THYSSEN KRUPP MATERIALS NA and | : | |
| COPPER & BRASS SALES, INC. | : | |

## *DAUBERT* MOTION OF DEFENDANT, INTERMATIC, INC., TO PRECLUDE PLAINTIFFS' LIABILITY EXPERT, MICHAEL WALD

Defendant, Intermatic, Inc. ("Intermatic"), by and through its attorneys, McCormick & Priore, P.C., hereby moves this Honorable Court for an Order precluding plaintiffs' liability expert, Michael Wald ("Wald"), of IEI Consulting, Inc. ("IEI"), from offering testimony at the trial of this matter pursuant to F.R.E. 702 and *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1998) and its progeny, as Mr. Wald's proposed testimony is patently  unreliable and not a "fit."  In support thereof, Intermatic avers and says the following:

1.       Due to the lack of methodology in the formulation of his expert report (the "Wald Report") and the opinions contained therein, and the *ipse dixit*[1] nature of those opinions, any testimony at trial on the part of Wald is unreliable and unfit for presentation to a jury in this

---

[1]       Latin for "he himself said it," an unsupported statement that rests solely on the authority of the person who said it. *The Gale Encyclopedia of American Law, 2d ed.*

matter, and Intermatic therefore respectfully requests that this Honorable Court exercise its *Daubert* gate-keeping function and preclude Wald from testifying at trial.

      2.      This products liability/negligence action was commenced on June 25, 2012, when plaintiffs, Donald, Loris, Eric, and Sandi Dalton (collectively "plaintiffs") filed a Complaint with this Court.  A true and correct copy of the aforementioned Complaint, listed on the docket as "Document 1."

      3.      On March 21, 2013, plaintiffs filed an Amended Complaint, to add a claim for certain damages only.  A true and correct copy of the aforementioned Amended Complaint is listed on the docket as "Document 38" and attached hereto, made a part hereof, and marked as Exhibit "A."

      4.      Plaintiffs were residents of real property owned by plaintiffs, Donald and Loris Dalton, which was the subject of an alleged fire and loss on March 9, 2012.  *See* Ex. A ¶¶ 1-7.

      5.      Plaintiffs alleged that the cause of the fire was both an alleged improper installation of the Intermatic product, an ML600TW Power Pack used to reduce current for low level exterior lighting ("Power Pack"),[2] by co-defendant, McCourt Electric LLC ("McCourt"), and a purported failure of electrical components for the Power Pack, designed and portions of which were manufactured by Intermatic.  *See* Ex. A ¶¶ 8-10.

      6.      Plaintiffs alleged that Intermatic was negligent in manufacturing the Power Pack, should be held strictly liable for alleged manufacturing defects, design defects, failure to warn, and failure to properly instruct as to proper use of the Power Pack, as well as be held liable for breaching implied warranties regarding the fitness of purpose and merchantable quality of the

---

[2]     The Power Pack converts higher levels of current from the 120-volt electrical outlets found in a house to approximately fifteen amperes (15i) of current from a twelve volt (12V) source through two (2) sets of terminals on each Power Pack, which can provide up to 300 watts of 60 hertz power, and are designed to handle a total of one hundred eighty watts (180W) of lighting. *See infra* for a true and correct photograph of a Power Pack terminal exemplar.

Power Pak. *See* Ex. A ¶¶ 13-16, 22-38.

7.      On May 28, 2013, the parties conducted the oral deposition of plaintiff, Donald

Dalton.  A true and correct copy of Donald Dalton's deposition transcript is attached hereto,

made a part hereof and marked as Exhibit "B."

8.      In the spring of 2006, Donald Dalton purchased four (4) Power Packs for Leslie

McCourt ("Mr. McCourt"), principal and owner of McCourt, to install. Ex. B at 57:22 – 58:18.

9.      When he returned home with the new Power Packs, Donald Dalton did not open

the packaging containing the Power Packs and examine their contents, but simply left them in his

basement until Mr. McCourt was able to come and install them.  Ex. B at 58:19-21.

10.     Donald Dalton testified that Mr. McCourt installed each Power Pack and

connected the wires for one (1) of the Power Packs in the basement that connected to the "up-

lights," which Power Pack is the subject of the fire in the instant litigation, while Donald Dalton

connected the wires to the other three (3) Power Packs.  Ex. B at 67:16 – 81:1 and Exhibit "D.

Dalton – 4" attached thereto.

11.     When Donald Dalton connected the wiring on the three (3) Power Packs, he

reviewed the instructions regarding the watts required for the string of lighting on the outside of

the box containing the Power Pack but did not read any instructions or documentation regarding

attaching the wires found inside the box. Ex. B at 81:2 – 82:9.

12.     Between the time of installation and wiring, and the time of the subject fire,

Donald Dalton did not have any issues or problems with the functioning of the Power Packs.  Ex.

B at 83:14 – 84:10.

13.     When the fire occurred, Donald Dalton observed the fire in the basement and he

noticed sparks and flames in the area around the subject Power Pack but not specifically on the

Power Pack itself.  Ex. B at 107:14 – 108:5.

14.     According to the Wald Report, Plaintiffs retained IEI to determine the cause of the fire at issue soon thereafter.  *See* page 1 of the Wald Report, dated November 15, 2013, and produced on November 18, 2013, a true and correct copy of which is attached hereto, made a part hereof and marked as Exhibit "C."

15.     In the immediate aftermath of the fire, Wald examined the fire scene,[3] recovered certain evidence including the Power Pack, and conducted an artifact inspection.[4]  Ex. C at 1.

16.     Upon investigation of the scene and examination of the artifacts within two (2) months of the fire,[5] and without conducting a single test or consulting a single published authority, Wald opined that there "were no other electrical failures which could have caused this fire other than the failure at the load terminal of the timer."[6]  Ex. C at 1.

17.     Wald claimed that "the section of metal bus that connects one leg of the transformer output to one of the screw terminal connections suffered a prolonged arcing failure." Ex. C at 2.

18.     Per Wald, the arcing failure was an "in-line arcing" event, in which "a conductor [i.e., terminal] breaks while current is being drawn through it and electrons jump (arc) from one side of the break to the other."  Ex. C at 2.

19.     This was caused, according to Wald, by "[s]ome defect . . . possibly a crack or a bubble in the metal, or else the metal [which comprised the terminal] was damaged during

---

[3]     There were two (2) fire scene investigations, on March 14, 2012, and again on April 6, 2012.
[4]     There were two (2) artifact examinations, on May 21, 2012, and again on April 2, 2013.
[5]     According to Wald's deposition testimony, he reached the conclusions contained in his report after the fire scene investigations and first artifact inspection on May 21, 2012.  For a further discussion, *see infra* ¶¶ 27-44 and referenced testimony.
[6]     These are not terms used internally by Intermatic.  These are solely the terms used by Wald in the Wald Report and his testimony and, insofar as the Motion refers to the Wald Report and Wald's testimony, Intermatic will use and discuss these terms as it understands Wald to use them.  Here, upon information and belief, Wald is referring to what Intermatic would refer to as the "terminal."

manufacture and assembly by Intermatic . . . ." Ex. C at 2.

20.     For the Court's edification and understanding, below are photographs of an exemplar terminal (also referenced as a "bus" in the Wald Report) and screw with attachment (i.e. clamping) plate for connecting wire to a set of lights:





21.    Wald opined that the "failure [i.e. "crack" or "bubble"] originated in the section of bus below the screw terminal end . . . in the area where the bus turns (is bent) 90 degrees from horizontal to vertical . . . ." Ex. C at 2.

22.    Wald claimed to have eliminated the possibility of a loose connection where a wires connected to a screw as a cause of the fire, upon examination of the artifacts only, because supposedly "there is no arcing or even melting at the stranded wiring at the screw terminal [i.e., where the wire connection is made on the terminal]." Ex. C at 2.

23.    Based just on "*the information presented above*,"[7] Wald somehow concluded that a "manufacturing defect in the load bus of one of the load terminals" of the subject Power Pack

---

[7]    This information, contained on pages 1-2 of the Wald Report, consisted of *only* the aforementioned scene investigation and artifact examination. There is no mention of any testing, experimentation, literature consultation or any further investigation in the report. *See infra.*

must have existed and caused "*[a]n arcing failure* . . . during normally expected use that *produced molten metal* which ignited nearby combustibles." Ex. C at 3 (emphasis added).

24.     On November 18, 2013, plaintiffs' counsel forwarded a copy of the Wald Report, dated November 15, 2013, which was the subject of earlier Motions.[8]

25.     On July 22, 2014, and October 8, 2014, the partiers conducted Wald's expert deposition. A true and correct copy of both parts of Mr. Wald's deposition testimony are attached hereto, made a part hereof and marked collectively as Exhibit "D."

26.     By correspondence, dated July 8, 2014, and September 19, 2014, the undersigned Noticed Wald's deposition. A true and correct copy of that correspondence and Notices are attached hereto, made a part hereof and marked as Exhibit "E."

27.     Wald was instructed to bring "[h]is entire case file and all materials in his possession regarding the above matter, including all artifacts," and, for the October 8 deposition specifically, this instruction was further elaborated so that "[t]he materials . . . include[], but [are] not limited to, all literature, studies, testing, evidence and documentation of testing, that support the opinions and conclusions [Wald] has offered, and any and all other documents and materials, by whatever name known, that [] Wald contends support his opinions and/or conclusions and report(s) in this matter." Ex. E.

28.     On each occasion, other than some artifacts taken from the scene, his C.V., billing records, photographs and a differently-dated copy of his report, Wald failed to bring any notes, testing results, outcomes of experimentation, scientific or industry literature or consultation with

---

[8]     Plaintiffs' eighteen (18) day delay in forwarding the Wald Report after their expert report deadline was the subject of a Motion for Preclusion and subsequent Order by this Court. A true and correct copy of the Court's Order is listed on the docket as "Document 57." Plaintiffs attempted to rectify this by filing a rebuttal report to Intermatic's expert reports on March 10, 2014, attempting a second bite of the apple and shoehorning opinions as to warnings and metallurgy in that report which were stricken by this Court's Order of April 7, 2014. A true and correct copy of the Court's Order is listed on the docket as "Document 80."

any resources.  Ex. D at 8:8 – 19:5, 178:7 – 181:7.

29.     He testified that what he brought were the entire contents of his file, save for a "little diagram of the [Dalton's] house" (which he thought didn't have "any real relevance").  Ex. D at 15:5-14.

30.     In fact, during his scene investigation and artifact inspections, Wald testified that he didn't even take any notes (either by hand or electronically), other than the above-mentioned diagram.  Ex. D at 15:24 – 16:15.

31.     Astonishingly, Wald admitted that he did not possess "any materials that would be directly responsive to that paragraph [*i.e.*, the "materials" requested that he bring to the deposition that supported his conclusions and opinions]" and there is nothing that he "particularly singled out for this case."  Ex. D at 180:12 – 181:2.

32.     Wald testified that, at the April 6, 2012, scene investigation, he concluded that "something broke" on the Power Pack and the "terminals showed evidence of electrical damage" which caused the subject fire.  Ex. D at 89:17 – 90:8.

33.     Wald testified that he reached no new conclusions at the May 21, 2012, artifact examination that he had not already reached at the April 6, 2012, scene investigation, noting that the "damage to the terminal was inconsistent with the typical damage [he] see[s] from a loose connection."  Ex. D at 94:13 – 95:11.

34.     Later, upon review of the photographs, Wald further concluded that there "was a deficiency in the metal bus of the bus terminal."  Ex. D at 95:16-24.

35.     After the May 21, 2012, artifact examination, Wald also stated in a conclusory fashion that the damage was "inconsistent with a loose connection" and the "terminal connections were all tight."  Ex. D at 96:13 – 98:10.

36.     Wald testified that this conclusion, that the connection of the wires to the terminal was "visibly tight," was based on a visual inspection only and not on any measurements, testing or consultation with standards.  Ex. D at 98:11 – 99:24.

37.     Wald testified that he never held the opinion that improper installation of the wire to the terminal played a role in the subject incident.  Ex. D at 106:5-9.

38.     Wald's sole bases for the opinions contained in his report, according to his own testimony, were the photographs, his own observations and his past forensic work, but no other testing, experimentation, or consultation of literature or standards.  Ex. D at 106:13 – 108:8.

39.     Wald, a member[9] of the National Fire Protection Association ("NFPA"), also claimed that he prepared his report in compliance with *NFPA 921*, the industry standard governing fire scene investigations, and followed the "scientific method."[10]  Ex. D at 109:6 – 110:22.

40.     Wald believed there was an overload in the terminal, because there was an insufficient amount of material to carry the current due to "cracking or some other defect in the material," which led to its heating and melting followed by "arcing through the molten metal" (and not through the air).  Ex. D at 119:9 – 120:24, 242:9-11.

41.     Wald concluded that there was a defect in the terminal material "somewhere near [the] bend such that it couldn't handle the current that was going through it" and it consequently "got hot and it melted and there was an arcing event."  Ex. D at 122:15-22.

42.     Essentially, Wald opined in his report that the alleged defect caused the terminal to get hot, hot enough to melt brass at approximately 1700 degrees Fahrenheit, by producing a "prolonged" "in-line" arcing event that melted the terminal.  *See* Ex. C *passim*; *see also* Ex. D at

---

[9]     *See* Ex. D at 19:9 – 20:21.
[10]    Chapter 4 of *NFPA 921* defines the "scientific method" regarding compliance with NFPA standards.  *See infra*.

117:19 – 121:7, 122:12-22, 127:6-7, 144:7 – 145:6, 229:2-9, 231:9 – 233:15.

43.    Wald defined "in-line arcing" as a phenomenon that "occurs when a conductor breaks while current is being drawn through it and electrons jump (arc) from one side of the break to the other." Ex. C at 2.

44.    Wald was unable to point to any tests, experiments or scientific or industry literature to prove that an arcing event could occur through molten brass, the metal which comprises the terminal at issue. Ex. D at 242:17 – 243:5, 245:5-8.

45.    Specifically, Wald did not perform any test or experiment to determine the feasibility of a "prolonged" "in-line" arcing failure in a brass-coated terminal that conducts 15 amperes of current from a twelve volt (12V) source; the most recent test he had done regarding *any* arcing damage to *any* metal was approximately twenty (20) years ago, and he has not produced those results here. Ex. D at 145:7 – 146:24.

46.    Wald also could not define a time frame during which his hypothesis, of what supposedly occurred, developed and transpired. 122:15-22, 231:18 – 233:15.

47.    Later, however, on October 8, 2014, contradicting his report and earlier testimony, Mr. Wald opined that "arcing is not – plays no real significant role in any of this we're talking about . . . [i]t doesn't play any significant role in this event at all." Ex. D at 254:8-14.

48.    Thus, Wald's opinion, without conducting any further analysis, testing, experimentation or research, or even reading anything, goes from stating that the event at issue involved a "prolonged" arcing event that was the alleged cause of the melting of the brass terminal, to arcing not playing any significant role at all in melting the terminal and the melting of the terminal just occurring from overheating because of an alleged defect; such vacillation and

10

total lack of methodology, violates or, perhaps more correctly, ignores the scientific method necessary to support an expert's opinion.

49.     Wald's lack of regard for the scientific method and proper analysis and methodology for offering expert opinion was further seen on October 8, 2014, when Wald also testified that, again contradicting his report and earlier testimony, the purported location of the defect and melting did not occur at the bend, but in the middle of the terminal. Ex. D at 203:13 – 204:15 and "Wald 10" and "Wald 11," true and correct copies of which are attached as exhibits thereto, and show where Wald marked the claimed location of the alleged defect in the terminal.

50.     Wald is also unable to determine the dimensions, size, shape, *or in any way describe* the nature of the defect whatsoever. Ex. D at 187:23 – 188:25.

51.     Wald is also unable to determine whether the defect was a "crack" or a "bubble," or whether it was supposedly damaged during manufacture, or assembly, of the terminal. Ex. D at 277:16 – 278:22, 283:11 – 284:7.

52.     Although Wald claimed to have seen "dozens" of other claims in which a conductor (*i.e.*, terminal) "fail[ed] due to insufficient cross-sectional area for the current for which it sought," critically he has never seen or been made aware of any case in which such a phenomenon occurred where only 20 amperes or less of current was transmitted from a 12 volt (12V) source via a terminal conductor, as in the extremely low levels of current involved with the Power Pack in this case. Ex. D at 194:13 – 199:23.

53.     Thus, Wald possesses no experiential foundation for offering his opinion that, because he has never seen a case where a brass terminal melted because of improper installation (which he admitted is an alternative explanation and the opinion of the cause of the fire from Intermatic's experts), ergo, there must have been some undefined defect in the terminal itself that

reduced the area in the terminal where current flows and somehow caused overheating of the terminal, as he has never seen such overheating from an alleged defect in the cross section of a terminal with the low voltage utilized in the Power Pack!

54.    Under Chapter 4 of *NFPA 921*, the fire investigator is to approach the investigation systematically, analyze the data and apply the scientific method, including *testing the hypotheses*, to his investigation.  A true and correct copy of *NPFA 921(4)* is attached hereto, made a part hereof and marked as Exhibit "F."

55.    During his deposition, despite testifying that he prepared his report in accordance with NFPA guidelines and the scientific method, Wald repeatedly testified that his opinion and the conclusions he reached in his report were not based on testing, experimentation or consultation, but are "common knowledge" and "basic physics," despite having the laboratory capability and access to perform testing and experimentation, in direct violation of *NFPA 921(4.3.6)*.  *See*, e.g., Ex. D at 137:4 – 139:21, 179:22 – 182:2, 199:24 – 200:9.

56.    Stated another way, Wald did not conduct any testing or research because, in his opinion, the origin and cause of the fire is "fundamental science" that "does not need any research," also in violation of *NFPA 921(4)*.  *See*, e.g., Ex. D at 187:14-17.

57.    Perhaps for these very reasons, during his sworn deposition, ***on a number of occasions he contradicted the conclusions contained in his very own report***.  *See*, e.g., ¶¶ 17-18, 33, 35-36, *supra*.

58.    According to *NFPA 921*, the "most likely cause of the overheating [at a terminal connection] will be a ***loose connection*** or the presence of restive oxides at the point of connection."  *NFPA 921 (8.10.4)* (emphasis added) (a true and correct copy of the pertinent sections of *NFPA 921(8)* are attached to Exhibit "F").

59.     In a somewhat odd conclusion, Wald testified that corrosion (oxidation)[11] was not required for his undefined "crack" or "bubble" theory to work, but did not test or evaluate his hypothesis because "corrosion could have been there [*i.e.* on the subject terminal within the alleged defect, a crack, bubble, etc., at the time of the fire]." Ex. D at 209:15 – 212:10.

60.     In other words, he admitted that he could perform a test or experiment to determine whether the "crack" or "bubble" reduced over time to cause his alleged phenomena, discussed *supra,* that is the basis of his theory, but he did no testing or experimentation to prove this hypothesis because, although it did not matter to his opinion if corrosion was present, he could not account for any of alleged corrosion to the terminal at the undefined "crack" or "bubble," so he did not test his theory.  *Id.*

61.     Such circular, specious logic neatly sums up the lack of reliability and assistance to a jury that Wald's opinion and testimony presents.

62.     Federal Rule of Evidence 702, along with the *Daubert* pronouncements and its progeny, embody a trilogy of restrictions on expert testimony:  qualification, reliability, and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also In re DVI, Inc. Sec. Litig.*,  No. 03-5336, 2014 U.S. Dist. LEXIS 129136, at *15 (E.D. Pa. Sept. 16, 2014).

63.     Stated differently, in order to be admissible under Fed. R. Evid. 702 and the *Daubert* standard, Wald must be qualified to offer the opinions he has authored in this case, those opinions must rest on a reliable foundation, and those opinions must "fit," i.e., they must be relevant and must assist the jury.  *Willis v. Besam Automated Entrance Sys., Inc. et al.*, No. 913, 2005 U.S. Dist. LEXIS 26466, at *15 (E.D. Pa. Nov. 4, 2005).

64.     It is clear that Wald's entire opinion rests upon his mere *ipse dixit*, contrary to

---

[11]     Wald considers oxidation and corrosion to go "hand-in-hand," as "[o]nce you start oxidizing you start corroding." Ex. D at 224:2-4.

scientific methodology, the *Daubert* principles and Fed. R. Evid. 702.

65.     An expert's mere statement of an opinion is not sufficient to constitute scientific knowledge, nor can an expert make his testimony admissible by simply saying it was arrived at through experience or general knowledge.  *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *see also General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ("noting in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

66.     Wald's conclusions are unreliable and would not assist the jury during trial of this matter because he has engaged in nothing more than "'a haphazard, intuitive inquiry' using 'little, if any, methodology beyond his own intuition'." *Furlan*, 864 F. Supp. 2d at 298 (*citing Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000)).

67.     Wald's opinions clearly fall short of the threshold set by under Fed. R. Evid. 702 and the *Daubert* standard.

68.     Respectfully, this Court should therefore preclude Wald from testifying at trial, for the all the reasons stated herein and for all the reasons stated in the accompanying Brief in Support, which is incorporated by reference as though fully set forth at length herein, as Wald's opinions are unreliable and do not fit the facts of this case, and would mislead and not assist the jury.

69.     Intermatic respectfully requests that the Court conduct a *Daubert* hearing in order to assist the Court in evaluating the true lack of any reliable, scientifically recognized grounds for Wald's claims.

**WHEREFORE**, defendant, Intermatic, Inc., respectfully requests that its Motion to preclude plaintiffs' expert, Michael Wald, from testifying at trial be granted and an Order be entered so precluding Mr. Wald.[12]

Respectfully submitted,

**MCCORMICK & PRIORE, P.C.**

BY: _s/Philip D. Priore_____
Philip D. Priore, Esquire (PA I.D. 38987)
Conrad James Benedetto, Esquire (PA I.D. 312404)
4 Penn Center, Suite 800
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Phone:  (215) 972-0161
Fax:  (215) 972-5580
ppriore@mccormickpriore.com
cbenedetto@mccormickpriore.com
Attorneys for Defendant,
Intermatic, Inc.

Date: November 6, 2014

---

[12]     It is believed, and therefore averred, that both Third Party Defendant, Deltran Corp., and Fourth Party Defendant, ThyssenKrupp Materials, NA, hereby join in the instant Motion.  Intermatic is therefore also submitting the instant Motion on Deltran's and ThyssenKrupp's behalf.

15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD DALTON AND LORIS       :
DALTON, h/w                     :
      and                      :
ERIC DALTON AND SANDI DALTON, h/w  :
                                  :
      v.                        :
                                  :
McCOURT ELECTRIC LLC         :    CIVIL ACTION
      and                      :
INTERMATIC, INC.            :    NO.  12-3568
                                  :
      v.                        :
                                  :
DELTRAN CORP.               :
                                  :
      v.                        :
                                  :
THYSSEN KRUPP MATERIALS NA and    :
COPPER & BRASS SALES, INC.      :

**BRIEF OF DEFENDANT, INTERMATIC, INC., IN SUPPORT OF ITS *DAUBERT*
MOTION TO PRECLUDE PLAINTIFFS' LIABILITY EXPERT, MICHAEL WALD**

      Defendant, Intermatic, Inc. ("Intermatic"),  hereby submits this Brief in support of its

Motion to preclude the testimony of plaintiff's expert, Michael Wald ("Wald") of IEI Consulting,

Inc. ("IEI"), pursuant to F.R.E. 702 and *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1998) and its progeny, as Mr. Wald's proposed testimony is unreliable and not a "fit."

## I.    <u>BACKGROUND</u>

      Plaintiffs, Donald, Loris, Eric and Sandi Dalton ("plaintiffs"), were residents of real

property, owned by Donald and Loris Dalton, which was the subject of a fire and loss on March

9, 2012.  *See* Ex. A ¶¶ 1-7.  They alleged that the cause of the fire was both an alleged improper

installation of the Intermatic product, an ML600TW Power Pack used to reduce current for low

level exterior lighting ("Power Pack"),[1] by co-defendant, McCourt Electric LLC ("McCourt"),
and a purported failure of electrical components for the Power Pack, designed and portions of
which were manufactured by Intermatic. *See* Ex. A ¶¶ 8-10. Plaintiffs alleged that Intermatic
was negligent in manufacturing the Power Pack, should be held strictly liable for alleged
manufacturing defects, design defects, failure to warn, and failure to properly instruct as to
proper use of the Power Pack, as well as be held liable for breaching implied warranties
regarding the fitness of purpose and merchantable quality of the Power Pak. *See* Ex. A ¶¶ 13-15,
20-34.

By way of further background, in the spring of 2006, Donald Dalton purchased four (4)
Power Packs for Leslie McCourt ("Mr. McCourt"), principal and owner of McCourt, to install.
Ex. B at 57:22 – 58:18. When he returned home with the new Power Packs, Donald Dalton did
not open the packaging containing the Power Packs and examine their contents, but simply left
them in his basement until Mr. McCourt was able to come and install them. Ex. B at 58:19-21.
Donald Dalton testified that Mr. McCourt installed each Power Pack and connected the wires for
one (1) of the Power Packs in the basement that connected to the "up-lights," which Power Pack
is the subject of the fire in the instant litigation, while Donald Dalton connected the wires to the
other three (3) Power Packs. Ex. B at 67:16 – 81:1 and Exhibit "D. Dalton – 4" attached thereto.
When Donald Dalton connected the wiring on the three (3) Power Packs, he reviewed the
instructions regarding the watts required for the string of lighting on the outside of the box
containing the Power Pack but did not read any instructions or documentation regarding

_____

[1]     As noted in Intermatic's Motion, the Power Pack converts higher levels of current from the 120-volt electrical outlets found in a house to approximately fifteen amperes (15i) of current from a twelve volt (12V) source through two (2) sets of terminals on each Power Pack, which can provide up to 300 watts of 60 hertz power,

attaching the wires found inside the box. Ex. B at 81:2 – 82:9. Between the time of installation and wiring, and the time of the subject fire, Donald Dalton did not have any issues or problems with the functioning of the Power Packs. Ex. B at 83:14 – 84:10. When the fire occurred, Donald Dalton observed the fire in the basement and he noticed sparks and flames in the area around the subject Power Pack but not specifically on the Power Pack itself. Ex. B at 107:14 – 108:5.

In the immediate aftermath of the subject fire, plaintiffs retained IEI to determine the origin of the fire. Within several days of the incident, Wald examined the fire scene,[2] recovered certain evidence including the Power Pack, and conducted an artifact inspection on May 21, 2012. *See* Ex. C at 1.

After inspection of the scene and examination of the artifacts, Wald concluded within two (2) months of the fire there "were no other electrical failures which could have caused this fire other than the failure at the load terminal of the timer."[3] Ex. C at 1. Wald later noted in the Wald Report that, after the May 21, 2012, artifact inspection, he had determined that "the section of metal bus that connects one leg of the transformer output to one of the screw terminal connections suffered a prolonged arcing failure" which was an "in-line arcing" event, in which "a conductor [i.e., terminal] breaks while current is being drawn through it and electrons jump (arc) from one side of the break to the other." Ex. C at 2. This was caused, according to Wald,

---

and are designed to handle a total of one hundred eighty watts (180W) of lighting.
  [2]     As noted in Intermatic's Motion, the two (2) fire scene investigations occurred on March 14, 2012, and April 6, 2012.
  [3]     As noted in Intermatic's Motion, these are not terms used internally by Intermatic. These are solely the terms used by Wald in the Wald Report and his testimony and, insofar as the Motion refers to the Wald Report and Wald's testimony, Intermatic will use and discuss these terms as it understands Wald to use them. Here, upon information and belief, Wald is referring to what Intermatic would refer to as the "terminal."

by "[s]ome defect . . . possibly a crack or a bubble in the metal, or else the metal [which comprised the terminal] was damaged during manufacture and assembly by Intermatic . . . ." *Id.* According to Wald, the "failure [i.e. "crack" or "bubble"] originated in the section of bus below the screw terminal end . . . in the area where the bus turns (is bent) 90 degrees from horizontal to vertical . . . ." *Id.*

By the first artifact inspection, on May 21, 2012, Wald claimed to have eliminated the possibility of a loose connection where a wires connected to a screw as a cause of the fire, upon examination of the artifacts only, because supposedly "there is no arcing or even melting at the stranded wiring at the screw terminal [i.e., where the wire connection is made on the terminal]." Ex. C at 2.  He had already concluded that a "manufacturing defect in the load bus of one of the load terminals" of the subject Power Pack caused "[a]n arcing failure occurred during normally expected use that produced molten metal which ignited nearby combustibles." Ex. C at 3.

On July 22, 2014, and October 8, 2014, the parties conducted Wald's deposition.  Wald was instructed to bring "[h]is entire case file and all materials in his possession regarding the above matter, including all artifacts," and, for the October 8 deposition specifically, this instruction was further elaborated so that "[t]he materials . . . include[], but [are] not limited to, all literature, studies, testing, evidence and documentation of testing, that support the opinions and conclusions [Wald] has offered, and any and all other documents and materials, by whatever name known, that [] Wald contends support his opinions and/or conclusions and report(s) in this matter." Ex. E.  On each occasion, other than some artifacts taken from the scene, his C.V., billing records, photographs and a differently-dated copy of his report, Wald failed to bring any notes, testing results, outcomes of experimentation, scientific or industry literature or

4

consultation with any resources. Ex. D at 8:8 – 19:5, 178:7 – 181:7. He testified that what he brought were the entire contents of his file, save for a "little diagram of the [Dalton's] house" (which he thought didn't have "any real relevance"). Ex. D at 15:5-14. In fact, during his scene investigation and artifact inspections, Wald testified that he didn't even take any notes (either by hand or electronically), other than the above-mentioned diagram. Ex. D at 15:24 – 16:15. Astonishingly, Wald admitted that he did not possess "any materials that would be directly responsive to that paragraph [*i.e.*, the "materials" requested that he bring to the deposition that supported his conclusions and opinions]" and there is nothing that he "particularly singled out for this case." Ex. D at 180:12 – 181:2.

Wald testified that, at the April 6, 2012, scene investigation, he concluded that "something broke" on the Power Pack and the "terminals showed evidence of electrical damage" which caused the subject fire. Ex. D at 89:17 – 90:8. Wald testified that he reached no new conclusions at the May 21, 2012, artifact examination that he had not already reached at the April 6, 2012, scene investigation, noting that the "damage to the terminal was inconsistent with the typical damage [he] see[s] from a loose connection." Ex. D at 94:13 – 95:11. After the May 21, 2012, artifact examination, Wald also stated in a conclusory fashion that the damage was "inconsistent with a loose connection" and the "terminal connections were all tight." Ex. D at 96:13 – 98:10. Later, upon review of the photographs, Wald further concluded that there "was a deficiency in the metal bus of the bus terminal." Ex. D at 95:16-24.

Wald testified that this conclusion, that the connection of the wires to the terminal was "visibly tight," was based on a visual inspection only and not on any measurements, testing or consultation with standards. Ex. D at 98:11 – 99:24. Wald testified that he never held the

5

opinion that improper installation of the wire to the terminal played a role in the subject incident. Ex. D at 106:5-9. Wald's sole bases for the opinions contained in his report, according to his own testimony, were the photographs, his own observations and his past forensic work, but no other testing, experimentation, or consultation of literature or standards. Ex. D at 106:13 – 108:8.

## II.   **LEGAL DISCUSSION**

The Federal Rules of Evidence governing testimony by experts provides as follows:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has interpreted a judge's role, at the outset of a trial, whether expert testimony is to be proffered based on whether the expert's scientific knowledge will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharmeceuticals*, 509 U.S. 579, 592 (1993). Under *Daubert* in this Circuit, trial courts must address "a trilogy of restrictions" before admitting expert testimony: qualification, reliability and fit. *Furlan v. Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 295 (E.D. Pa. 2012). The proponent of an expert – in this case, plaintiffs – must establish by a preponderance of the evidence that an expert is qualified and that the expert's testimony is admissible. *Daubert v. Merrell Dow*

6

*Pharmaceuticals,* 509 U.S. 579, 593 n.10 (1993); *see also Dearson v. Bostrom Seating, Inc., et al.*, 241 F.Supp. 494 (E.D. Pa. 2003).

With respect to qualification, the witness must have "specialized knowledge" regarding the area of testimony. *Betterbox Commc'ns Ltd. V. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002). Reliability means that the particular opinion offered is based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation," meaning the expert must have "good grounds" for his or her belief. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994 (*"Paoli II"*); *see also Furlan*, 864 F. Supp. 2d at 295-96. With regard to the "fit" requirement, the expert's testimony must assist the trier of fact to understand the evidence to determine a fact at issue. *Furlan*, 864 F. Supp. 2d at 296.

### A.    WALD'S OPINION IS UNRELIABLE

Wald should be precluded from testifying at the trial of this matter as his report and anticipated testimony are clearly unreliable. As discussed more fully below, Wald's opinion lacks the requisite foundation for the bases of his opinions and, simply put, his entire line of testimony would rely on the principle of *ipse dixit*.

### 1.    Wald's Opinions are Unreliable When Applied to the *Daubert* Standard

Even if one sets aside the issue of whether Wald possesses the necessary qualifications to provide opinions in this case, a cursory review of Wald's Report and deposition testimony regarding his methodology for reaching his opinions and conclusions reveals that it lacks any reliable foundation. In *Daubert*, the Supreme Court said that determining whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact involves a

"preliminary assessment of <u>whether the reasoning or methodology underlying the testimony is</u> <u>scientifically valid</u> and of whether that reasoning or methodology properly can be applied to the facts in this case." *Westley v. Ecolab, Inc. et al.*, no. 1372, 2004 U.S. Dist. LEXIS 9936, at *7 (E.D. Pa. May 12, 2004) *(citing Daubert*, 509 U.S. at 592-93 (emphasis supplied)). Further, "[i]f *Daubert* and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert." *Furlan*, 864 F. Supp. 2d at 298 (citations omitted).

     *Daubert* sets forth a non-exclusive checklist for trial courts to use in assessing the liability of scientific expert testimony. Some of the specific factors listed by the Court are:

- whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;

- whether the technique or theory has been subject to peer review and publication;

- the known or potential rate of error of the technique or theory when applied;

- the existence and maintenance of standards and controls; and

- whether the technique or theory has been generally accepted in the scientific community.

*See Daubert*, 509 U.S. at 594-95; *see also Westley*, 2004 U.S. Dist. LEXIS 9936, at *7; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).

     Here, Wald performed nothing in the way of testing his conclusions, nor did he apply any scientific analysis to the facts at issue. In his report, he opined that a tin-coated brass terminal

located in the Power Pack, which conducts the electricity from the power source through the
Power Pack into the outdoor lighting, was defectively manufactured and had either a "crack" or
"bubble" in it when purchased by plaintiffs and installed in their basement.  Ex. C.  This
undefined "crack" or "bubble" corroded and changed shape over a period of six (6) years
between the time of purchase and date of the fire, and due to heat at the source of the crack,
melted the plastic surrounding the terminal and brass itself, included an arcing event, and started
the fire. Ex. C; Ex. D at 89:17 – 90:8, 119:9 – 120:24, 122:15-22, 188:8-25, 207:23 – 215:17,
242:9-11, 277:16 – 278:22, 283:11 – 284:7.  However, Wald, both in his report and during his
deposition testimony, is unable to identify, *inter alia*, to the following:

- the size of the "crack" or "bubble" or any information as to its shape, form or
  dimensions;

- the specific location on the terminal of the "crack" or "bubble;"

- when the "crack" or "bubble" manifested itself;

- how an Intermatic employee would have assembled a terminal into a Power Pack
  with a "crack" or "bubble;"

- how the "crack" or "bubble" supposedly corroded or deteriorated over time;

- how the supposedly corroded or deteriorated "crack" or "bubble" overheated on
  the date of the fire;

- how the "crack" or "bubble" caused the fire; and

- how an arcing event could occur through solid or liquid metal.

Ex. D *passim*.

    At his deposition, Wald specifically admitted to not performing any testing or
experimentation at all in preparation for his expert report, relied on no specific principles, and

9

could not point to one piece of scientific information upon which he based his opinion, repeatedly testifying that this is "common knowledge" and all information contained in his expert report is "basic science." *See*, e.g., Ex. D at 137:4 – 139:21, 179:22 – 182:2, 242:17 – 243:5, 245:5-8.  For example, he defined "in-line arcing" as a phenomenon that "occurs when a conductor breaks while current is being drawn through it and electrons jump (arc) from one side of the break to the other." Ex. C at 2.  Further, Wald did not perform any test or experiment to determine the feasibility of a "prolonged" "in-line" arcing failure in a brass-coated terminal that conducts 15 amperes of current from a twelve volt (12V) source; the most recent test he had done regarding *any* arcing damage to *any* metal was approximately twenty (20) years ago, and he has not produced those results here. Ex. D at 145:7 – 146:24.  However, on October 8, 2014, he contradicted his report and earlier testimony, unbelievably testifying that "arcing is not – plays no real significant role in any of this we're talking about . . . [i]t doesn't play any significant role in this event at all." Ex. D at 254:8-14.

Wald's lack of regard for the scientific method and proper analysis and methodology for offering expert opinion was further seen on October 8, 2014, when Wald also testified that, again contradicting his report and earlier testimony, the purported location of the defect and melting did not occur at the bend, but somewhere in the middle of the terminal. Ex. D at 203:13 – 204:15 and "Wald 10" and "Wald 11," true and correct copies of which are attached as exhibits thereto, and show where Wald marked the claimed location of the alleged defect in the terminal.  Wald was unable to determine the dimensions, size, shape, *or in any way describe* the nature of the defect whatsoever, or whether the defect was a "crack" or a "bubble," or whether it was supposedly damaged during manufacture of the terminal or assembly of the final product. Ex. D

10

at 187:23 – 188:25, 277:16 – 278:22, 283:11 – 284:7.  Although Wald claimed to have seen "dozens" of other claims in which a conductor (*i.e.*, terminal) "fail[ed]" due to insufficient cross-sectional area for the current for which it sought," ***critically he has never seen or been made aware of any case in which such a phenomenon occurred where only 20 amperes (20i) or less of current was transmitted from a 12 volt (12V) source via a terminal conductor, such as in the extremely low levels of current involved with the Power Pack in this case***.  Ex. D at 194:13 – 199:23.

Thus, Wald possesses no experiential foundation for offering his opinion that, because he has never seen a case where a brass terminal melted because of improper installation (which he admitted is an alternative explanation and the opinion of the cause of the fire from Intermatic's experts), there must have been some undefined defect in the terminal itself that reduced the area in the terminal where current flows and somehow caused overheating of the terminal.  In fact, as noted above, he has never seen such overheating from an alleged defect in the cross section of a terminal with such low voltage as utilized in the Power Pack.

He also could not define a time frame in which his hypothesis on what supposedly took place developed and occurred.  122:15-22, 231:18 – 233:15.  In a somewhat odd conclusion, Wald testified that corrosion of the terminal (oxidation) was not required for his undefined "crack" or "bubble" theory to work, but did not test or evaluate his hypothesis because "corrosion could have been there [*i.e.* on the subject terminal within the alleged defect, "crack," "bubble," etc., at the time of the fire]."  Ex. D at 209:15 – 212:10.  In other words, he admitted that he could perform a test or experiment to determine whether the "crack" or "bubble" reduced over time to cause his alleged phenomena, discussed *supra,* that is the basis of his hypothesis, but he

11

did no testing or experimentation to prove this hypothesis because, although it did not matter to his opinion if corrosion was present, he could not account for any of alleged corrosion to the terminal at the undefined "crack" or "bubble," so he did not test his theory. *Id.*

Such circular, specious logic neatly sums up the lack of reliability and assistance to a jury that Wald's opinion and testimony presents. Wald's bald opinion is that the origin and cause of the fire is "fundamental science" that "does not need any research." *See*, e.g., Ex. D at 187:14-17. He engaged in nothing more than "'a haphazard, intuitive inquiry' using 'little, if any, methodology beyond his own intuition'." *Furlan*, 864 F. Supp. 2d at 298 (*citing Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000).

Without going into excessive detail, a review of the factors listed in *Daubert* that a court should and/or could consider in assessing the reliability of an expert's proffered opinion establishes that, literally, the methodology used by Wald to arrive at his opinions in this case satisfies almost none of these factors: (1) testable hypothesis – he has not performed *any* testing and his lack of testing disproves his conclusion; (2) peer review – not performed; (3) known or potential rate of error – none offered and/or is unknown; (4) standards controlling the technique's operation – none; (5) method is generally accepted – no such evidence exists; (6) relationship of the technique to methods which have been established to be reliable – not shown. Without question, Wald's opinions not only do not rest on a reliable foundation, it simply does not exist.

By a preponderance of the evidence, it is clear that Wald's opinion is not reliable. The only "standard" that guided Wald's analysis in forming his report and testimony was his "perception" and he conducted no tests. *Furlan*, 864 F. Supp. 2d at 298. On this basis alone, Wald should be precluded from testifying at the trial of this matter.

12

## 2.   Wald's Opinions Are Unreliable under *Daubert* Progeny

Courts have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact.  For example, whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion is another factor.  *See General Electric Co. v. Joiner*, 522 U.S. 135, 146 (1997) (in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

Although the focus of a trial court's assessment with regard to the reliability prong of the *Rule 702* and *Daubert* standard is the reliability of the *methodology* by which the expert derived his or her conclusions, not the correctness of the conclusions themselves, courts in this jurisdiction have frequently noted that the Supreme Court has stated that "conclusions and methodology are not entirely distinct from one another."  *See, e.g., Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (*quoting General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *Rapp v. Singh*, 152 F.Supp. 2d 694, 699 (E.D. Pa. 2001).  A court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used."  *Id.* (emphasis supplied).  An expert's mere statement of an opinion is not sufficient to constitute scientific knowledge, nor can an expert make his testimony admissible by simply saying it was arrived at through experience or general knowledge.  *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *see also General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ("noting in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

13

This last comment, regarding what a court examines when presented with a *Daubert* challenge, is particularly relevant in this matter. As the Court can see from a review of the Wald Report, as well as his deposition testimony, Wald's opinion regarding the alleged defect in the Power Pack terminal centers on the notion that a "crack" or "bubble" was present during either manufacture of the terminal or assembly of the final product. *See* Ex. C at 1-2; *see also* Ex. D at 119:9 – 120:24, 242:9-11. Wald based his opinions and conclusions to be offered to the jury solely on his observations at the Daltons' residence during a scene inspection on April 6, 2012, his examination of the artifacts on May 21, 2014, and a cursory review of the photographs of those artifacts. Wald specifically did not consult any specific scientific literature, articles or industry information or perform any testing or experimentation. *See* Ex. D at 106:13 – 108:8. Further, he is unable to determine the size, shape, or even a specific *location* of the "crack" or "bubble" on the terminal, or when this alleged defect manifested itself. Ex. D at 188:8-25, 203:13 – 204:15, 277:16 – 278:22, 283:11 – 284:7.

More importantly, Wald's opinion as to the cause of the fire has changed. On November 18, 2013, he opined in the Wald Report that "the section of metal bus that connects one leg of the transformer output to one of the screw terminal connections suffered a 'prolonged' arcing failure." Ex. C at 2. However, On October 8, 2014, contradicting his earlier report, Wald opined that "arcing is not – plays no real significant role in any of this we're talking about . . . [i]t doesn't play any significant role in this event at all." Ex. D at 254:8-14.

This "prolonged" "arcing failure" forms the entire basis of the Wald Report and plaintiffs' theories of negligence, strict liability and breach of warranty against Intermatic, for if there is no arcing failure, plaintiffs and Wald are unable to point to a cause of the fire on the

14

terminal itself.   In other words, Wald's opinion, without conducting any further analysis,

testing, experimentation or research, or even reading anything, goes from stating that the event at

issue involved a "prolonged" arcing event that was the alleged cause of the melting of the brass

terminal, to arcing not playing any significant role at all in melting the terminal and the melting

of the terminal just occurred from overheating from an alleged defect; such vacillation and total

lack of methodology, violates or, perhaps more correctly, ignores the scientific method necessary

to support an expert's opinion.

It is clear, therefore, that the opinions that Wald intends to offer at trial are not only

unreliable, but are at times contradictory.   Since the trial court "must examine the expert's

conclusions in order to determine whether they could reliably flow from the facts known to the

expert and the methodology used," it can be said that Wald's's conclusions in the instant matter

do not reliably flow "from the facts known to the expert and the methodology used."   Wald

proposes that the jury agree with him simply by his *ipse dixit*.

### 3.    Wald's Opinions Are Unreliable under Fire Investigation Standards

Further, Wald's opinions fail to meet the standards as set forth in *NFPA 921*, the National

Fire Protection Association ("NFPA").   Wald, a member of the NFPA, claimed that he prepared

his report in compliance with *NFPA 921*, the industry standard governing fire scene

investigations, and followed the "scientific method."   Ex. D at 109:6 – 110:22.   Under Chapter 4

of the *NFPA 921*, the standards governing fire scene investigations, the investigator is to

approach the investigation systematically and apply the scientific method, including *testing the*

*hypotheses*, to his investigation.   Ex. F.

15

During his deposition, Wald repeatedly testified that his opinion and the conclusions he reached in his report were not based on testing, experimentation or consultation, but are "common knowledge" and "basic physics," despite having the laboratory capability and access to perform testing and experimentation. *See,* e.g., Ex. D at 137:4 – 139:21, 179:22 – 182:2, 199:24 – 200:9. Stated another way, Wald did not conduct any testing or research because, in his opinion, the origin and cause of the fire is "fundamental science" that "does not need any research," in violation of Chapter 4 of *NFPA 921*. *See,* e.g., Ex. D at 187:14-17. Furthermore, Wald also failed to take into account that, according to *NFPA 921*, the "most likely cause of the overheating [at a terminal connection] will be a ***loose connection*** or the presence of restive oxides at the point of connection." Ex. F at *8.10.4* (emphasis added).[4]

### 4.   Wald's Opinions Have Been Deemed Unreliable in other Circuits

Finally, Wald's opinions have been deemed "unreliable" elsewhere in the Federal Court system. For example, in 2005, the Court of Appeals for the Eighth Circuit affirmed the District Court's Order precluding Wald's testimony under a *Daubert* challenge because his methodology was lacking and his experimental testing did not meet the standards of *NFPA 921*. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058 (8th Cir. 2005). As here, the *Canon* Court concluded that Wald failed "[to] propose[] a *specific defect* on the [product] that might have caused the fire." *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005) (emphasis added). Wald also did not "carefully examine[] []his hypothesis of fire origin against empirical data obtained from fire scene analysis *and appropriate testing, as*

---

[4]      Wald agrees that the cause of the fire could have been a loose connection, as established by Intermatic's experts, and that it was either his manufacturing defect hypothesis or a loose connection. Ex. D at 222:19-22.

*required by NFPA 921*", which he also failed to do here. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005) (emphasis added). The *Canon* Court concluded that the district court "did not abuse its discretion in concluding that the evidentiary support for the composite power supply board theory was inadequate." *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1059 (8th Cir. 2005). Because Wald "did not apply the principles and methods of *NFPA 921* reliably to the facts of the case, the district court did not abuse its discretion in concluding that . . . Wald's expert opinions were unreliable [and] [a]s a result, it was not error to exclude these expert opinions. *Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1060 (8th Cir. 2005).

Wald has failed to use reliable methods in reaching his conclusions in accordance with the standards of his profession under *NFPA* 921, as well as those as set forth under Fed. R. Evid. 702, *Daubert* and its progeny. Consequently, Wald's proffered opinions are completely unreliable and he should be precluded from offering them to the jury at the trial of this matter.

**B.    WALD'S OPINION DOES NOT "FIT"**

Wald should also be precluded from testifying at the trial of this matter because, as his methods of reaching his conclusions are unreliable, they do not fit the facts and evidence in this case. The Federal Rules of Evidence specifically provide that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods ***have been properly applied to the facts of the case***. Fed. R. Evid. 702 (emphasis added). As the Third Circuit has noted, "***any step*** that renders the analysis unreliable . . . renders the expert testimony inadmissible. *In Re Paoli RR Yard PCB Litigation*, 35 F. 3d 717, 745 (3d

Cir. 1994).  This is true "whether the step completely changes a reliable methodology or merely misapplies that methodology."  *Id.*

Thus, to be admissible under Fed. R. Evid. 702, the expert's testimony must not only be offered by someone who is qualified in the field involved and whose opinion and methodology is "reliable," that testimony must also be relevant and must assist the trier of fact.  *Furlan*, 864 F. Supp. 2d at 296.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (*citing Daubert*, 509 U.S. at 591).  "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  *Id.*  "Even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Maldonado v. Walmart Store*, no. 3458, 2011 U.S. Dist. LEXIS 50255, at *17 (E.D. Pa. May 9, 2011) (*quoting In re Paoli*, 35 F.3d at 743) (emphasis in original)).  The expert's testimony must be relevant and its admissibility depends, at least in part, upon the proffered connection between the scientific research or test result to be presented and the particular disputed factual issues in the case.  *Willis v. Besam Automated Entrance Sys., Inc. et al.*, no. 913, 2005 U.S. Dist. LEXIS 26466, at *15 (E.D. Pa. Nov. 4, 2005) (citations omitted), *aff'd*, 2007 U.S. App. LEXIS 14782 (3d Cir. June 21, 2007).

Importantly in this regard, Wald's opinion that the overheating of the terminal was caused by an unspecified manufacturing defect in the brass terminal (as opposed to a loose connection to the brass terminal because of an improperly tightened screw, the other potential cause admitted by Wald) does not "fit" the facts of this case, as no facts have been offered that an overheated

brass terminal has ever resulted from a defect in the brass terminal as hypothesized by Wald.[5]

Nor has Wald ever seen a defect in an electrical product produce such an overheating event with

the voltage as low as existed in the subject Power Pack. Thus, Wald's hypothesis of a supposed

manufacturing defect does not "fit" this case, as these undisputed facts do not apply to his theory.

Wald's opinions are without any foundation, and at times contradictory, and therefore

cannot by any stretch of the imagination be considered relevant in determining whether the

subject Power Pack was defective, nor would it assist the trier of fact in that assessment. The

"proffered connection" between the methodology used by Wald in reaching his conclusions and

the disputed fact here, whether the subject fire was caused by a defective terminal, as claimed by

Wald, or a loose connection, as claimed by Intermatic's experts, simply does not exist.

Essentially, Wald wants to testify that the Power Pack terminal was defective because his

observations of the subject terminal after the fire lead him to believe there was a "crack" or

"bubble" in the brass at the time of manufacture or assembly, though Wald is unable to describe

the size or location of such defect. Wald did not provide any testing, experimentation or analysis

to show *why* this hypothesis should be considered. Offering an opinion that is contradicted by

***the expert himself*** and betrayed by the expert's lack of testing, experimentation and analysis is

the epitome of an opinion that does not "fit" under Fed. R. Evid. 702 and *Daubert*.

It has also been further extrapolated, in the notes following Fed. R. Evid. 702, that

subpart one of Fed. R. Evid. 702 calls for a quantitative rather than qualitative analysis. The

amendment [to Rule 702] requires that expert testimony be based on sufficient underlying "facts

---

[5]        In fact, the evidence establishes that no such defect has ever been observed in almost 75,000,000
terminals used since 2001. *See* page 4 of the report of Intermatic's liability expert, Wayne Veach, a true and correct
copy of which is attached hereto, made a part hereof and marked as Exhibit "G."

19

or data." Here, the "facts or data" on which Wald bases his conclusion not only are non-existent and do not support the proffered opinion, but also contradict his proffered opinion.

Wald's mere saying that a defect existed does not provide the opinion with the necessary level of reliability required by Fed. R. Evid. 702 and *Daubert* and its progeny, and renders the opinion irrelevant and of no assistance to the jury. Accordingly, Wald's proposed opinions in this matter do not meet the requirements of "fit" under Fed. R. Evid. 702 and *Daubert*, and thus he should be precluded from testifying on this basis as well.

### C.   THE COURT SHOULD HOLD A *DAUBERT* HEARING

In order for this Honorable Court to fully appreciate the lack of reliability and "fit" of Wald's theory, Intermatic respectfully requests that the Court hold a *Daubert* hearing where it can assess Wald, as well as hear from Intermatic's experts, Wayne Veach and Jack Olsen, who can explain the total lack of scientific support for Wald's "crack/bubble" theory,[6] including, e.g., Wald's notion that an arc can occur through a molten metal such as brass. Accordingly, Intermatic requests that the Court hold a *Daubert* hearing on its Motion.

### III.   CONCLUSION

As can be seen by the above discussion, the proffered opinions of plaintiff's liability expert, Michael Wald, are completely unreliable, lack any factual foundation as required by Fed. R. Evid. 702 and *Daubert*, and constitute nothing more than his *ipse dixit*. It is therefore

---

[6]      *See* Ex. C and report of Intermatic's liability expert, Jack Olsen, a true and correct copy of which is attached hereto, made a part hereof and marked as Exhibit "H."

20

respectfully submitted that, for the all the reasons stated herein and for all the reasons stated in Intermatic's Motion, Mr. Wald be precluded from testifying at trial in this matter.

Respectfully submitted,

**MCCORMICK & PRIORE, P.C.**

BY: _s/Philip D. Priore_____
Philip D. Priore, Esquire (PA I.D. 38987)
Conrad James Benedetto, Esquire (PA I.D. 312404)
4 Penn Center, Suite 800
1600 John F. Kennedy Boulevard
Philadelphia, PA   19103
Phone:  (215) 972-0161
Fax:  (215) 972-5580
ppriore@mccormickpriore.com
cbenedetto@mccormickpriore.com
Attorneys for Defendant,
Intermatic, Inc.

Date: November 6, 2014

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the attached *Daubert*

Motion to Preclude Plaintiffs' Liability Expert, Michael Wald, and Brief in Support presented by

Defendant, Intermatic, Inc., was filed electronically and is available for viewing and

downloading from the ECF system.  A true and correct copy of the Motion and Brief was

forwarded to counsel identified below via ECF.

Kenneth T. Levine, Esquire
Joseph L. McGlynn, Esquire
Deluca Levine LLC
518 Township Line Road
Suite 300
Blue Bell, PA   19422

Greg Ray, Esquire
Comeau & Bunker
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 500
Philadelphia, PA   19103-2808

Bradley D. Remick, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA   19103-4797

Kevin B. Golden, Esquire
Shimberg & Friel, P.C.
20 Brace Road
Suite 350
Cherry Hill, NJ 08034

### MCCORMICK & PRIORE, P.C.

BY:   *s/Philip D. Priore*
      Philip D. Priore, Esquire (PA I.D. 38987)
      Conrad James Benedetto, Esquire (PA I.D. 312404)
      4 Penn Center, Suite 800
      1600 John F. Kennedy Boulevard
      Philadelphia, PA   19103
      Phone:  (215) 972-0161
      Fax:  (215) 972-5580
      ppriore@mccormickpriore.com
      cbenedetto@mccormickpriore.com
      Attorneys for Defendant,
      Intermatic, Inc.

Date: November 6, 2014