### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DONALD DALTON AND LORIS DALTON, H/W AND ERIC DALTON AND SANDI DALTON, H/W**<br>                    **Plaintiffs**<br><br>**vs.**<br><br>**INTERMATIC, INC., et al.,**<br>                    **Defendants** | **Civil Action No:  2:12-CV-03568** |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF RESPONSE TO MOTION TO PRECLUDE TESTIMONY OF MICHAEL WALD

Plaintiffs, Donald Dalton and Loris Dalton, h/w, and Eric Dalton and Sandi Dalton, h/w, by and through undersigned counsel, herein provide this memorandum of law in support of their Response to the Motion to Preclude Testimony filed by Defendant Intermatic, Inc., and in so doing aver as follows:

### I.      SUMMARY

Following an investigation and evidence inspection led by Plaintiff's electrical engineering consultant Michael Wald, all of the parties and their experts have uniformly come to agree that the fire that destroyed Plaintiffs' home on March 9, 2012 began from <u>within</u> an Intermatic PowerPack.  The physical evidence recovered by Michael Wald is so clear and obvious to demonstrate that the components within the Intermatic terminal block overheated and malfunctioned that the defendants cannot and do not contest that the fire originated within the Intermatic product.  The only question as to liability that remains is why it malfunctioned.

Anecdotally, this is an incredibly rare case in fire litigation due to the destruction typically caused by fires themselves to the evidence that would otherwise demonstrate the origin and/or cause of a fire.  Manufacturing defendants or service contractor defendants typically attempt to deflect liability in such murky situations by identifying a different origin location, an alternative product source, and/or the involvement of external human causes (such as discarded cigarettes or arson).  The evidence in this case, that being the internally melted terminal of the Intermatic PowerPack, cannot be spun or avoided – it overheated and malfunctioned 6 years after purchase and installation, and the only liability issue is why.

As the failed component was internal to the Intermatic PowerPack, Plaintiff's expert Michael Wald, considered the only three hypotheses[1] available due to the evidence retained:

1.  an inherent manufacturing defect of the terminal components that eventually malfunctioned, or

2.  a loose or otherwise improper connection made by the installer McCourt Electric to the terminal 6 years earlier that eventually resulted in the overheating of the connection and the malfunction of the product.

3.  the PowerPack, wiring and components were overloaded with improper bulbs or other electrical elements downstream.

 In order for the court to best appreciate and analyze the factual and legal arguments as to the nature of this product, its role and setup at the property, its relevant components, and its malfunction, the court should understand the following macro circuit that existed:

Electrical cord  >> PowerPack >> Wiring for Exterior Landscape Lights >> Lights

---

[1] It should be noted that these were the only three hypotheses suggested, proposed, addressed or rebuked by any of the parties or their experts to explain this malfunction.  Further hypothesis #3, as to a possible overload was reviewed by Wald  and defendant's expert and disregarded as the load was deemed well within proper limits.

The focus of this litigation is on the components of the terminal block components of the PowerPack in the area where it connects to the wiring for the exterior lights:

> Wire from inside PowerPack >> Screw Connection to Terminal >> "L"- shaped Terminal >> Screw Connection to Exterior Wiring >> Exterior Wiring

These five connections are viewed in the following photograph, that depicts the subject components that malfunctioned on the bottom, and an exemplar set of components that had been situated near the subject ones inside the Subject PowerPack.



The wires coming from inside the PowerPack enter the photo from the left side then connect to the "L"- shaped Terminal through a clamp and screw connection.  This internal wire, first screw connection and extended leg of the "L"- shaped Terminal (the horizontal leg in these pictures) are all internal to the PowerPack and cannot be viewed unless the PowerPack is disassembled.  The terminal (which is situated within a terminal block on the bottom of the PowerPack) then bends in its "L"-shaped manner as best displayed in the exemplar set at the top.

After the bend, there is a second Screw Connection available to connect to the exterior wiring servicing the exterior lights.  Portions of this leg of the terminal and the screw connection are visible to the installer consumer.  It is at this screw connection that an installer of the product will make such connection with the exterior wires (depicted as running down out of the picture).



The above picture of a truly pristine exemplar is provided in the report of Defendant's expert jack Olsen, and hopefully further clarifies the nature of the "L"-shaped terminal.

The first picture, taken and cropped from the Wald Report (Exhibit "B") demonstrates a few important points of interest.  The horizontal long leg of the lower terminal depicted is melted away almost to the initial screw connection and relatively far away from the screw connection to the exterior wiring.  This melting so far down and away from the exterior screw connection had never before been observed by Mr. Wald, or any of the other experts, on terminals that overheated and malfunctioned due to loose exterior screw connections.  On a related point, defendant's experts tried to recreate this phenomena by creating and overheated loose connections in a laboratory setting.  Try as they might, in accord with Wald's expert opinions,

they were unable to heat up the horizontal longer leg of the terminal at all.  The following is a photo from Defendant's expert Jack Olsen's report depicting the most comparative overheating he could achieve:[2]



,

As Olsen testified in his deposition, none of his "experiments, videotaped, photographed, or otherwise were run to a point of a heated glowing connection that caused the melting beyond the 90 degree bend of the terminal."  Olsen Deposition, pp. 254-55 (Exhibit "D").  It should be appreciated that this overheating and melting of the horizontal leg is exactly what he was trying to achieve and yet was unable to do so.  *Id.* at 260.  Moreover, as depicted by the glowing (and nonglowing) areas of the terminal, Olsen was never able to even overheat the horizontal longer leg portion that melted within the subject PowerPack (as it does not even glow in the picture

---

[2]  The photograph from page 22 of Olsen's report is flipped here horizontally and tilted simply to maintain the orientation of the first two pictures above.

above).  This was admitted by defendant's expert and corporate designee, Wayne Veach, who noted that the screw connection on the horizontal leg drew away the heat from that leg when a loose connection occurs.  This phenomena is described by Veach in his deposition of October 10, 2014 on pages 97-99 (Exhibit "C").  In other words, visually, experientially and scientifically there is no basis to conclude that this unique melting on the horizontal leg was caused by overheating from a loose connection.

The final point of contention that could benefit from some visual assistance has to do with evidence related to the tightness of the connection between the stranded wire running to the exterior lights and the screw connection elements.  The following close-up cropped photo from Wald's report (Exhibit "B") depicts the wire connected to the remaining elements of the screw connection:



Please note that portions of the terminal that were in contact with the screw and stranded wire have melted away and the compression forces are no longer completely holding the wire in place

in the screw connection.  Further, it is self-evident that the copper wire was subjected to a serious fire and the consequential expansion when heated in the fire and compression when cooled. Nonetheless, Wald reviewed this evidence and noted in his report (as well as his deposition testimony) that this wiring remained visibly tight to the screw connection elements and that the stranded wire experienced no arcing or melting throughout.  As noted in his deposition testimony, he was comparing such circumstances to other situations he had investigated with different findings indicating loose connections (with visibly loose connections or affected wiring after the fire).

Stepping back from the microscope view of the products and components involved, the circumstances can be best stated that it is undisputed that a malfunction of and within the PowerPack occurred, and that there remains a dispute amongst the experts as to why that overheating and malfunction occurred.  It is in this limited context that this Honorable Court is asked to judge the qualifications behind, reliability of, and fit of Michael Wald's testimony. Based upon the factual record before this court, and the substance and basis of Wald's limited opinions actually expressed and contested, Defendant's motion to preclude Wald's testimony should certainly be denied,

II.     **PROCEDURAL HISTORY**

Plaintiffs' initial pleadings asserted alternative claims alleging that the cause of the fire was either an improper installation of the PowerPack by original defendant Leslie McCourt or a defect of the terminal component integrated into the terminal block of the PowerPack manufactured and sold by Intermatic.   When Plaintiffs proceed to trial in this matter they will be limiting their claims as to the parties and as to particular claims against the parties, as it is

Plaintiffs' intent to proceed to trial and assert a claim only against defendant Intermatic on a claim for strict product liability due to the aforementioned malfunction of Intermatic's product and the negation of alternative causes for such malfunction other than due to a manufacturing defect.  This claim was asserted and preserved in Plaintiffs' pleadings.

The expert report of Michael Wald, an electrical engineering consultant, was produced on or about November 18, 2013, and is attached hereto as Exhibit "B."  Wald opined, as noted above, that at the time of manufacture of the subject Power Pack the brass "terminal" component (which all parties agree overheated and failed) must have had an inherent defect or flaw at the time of its manufacture and sale - and that such defect was the eventual proximate cause of the underlying fire and Plaintiffs' claim and damages.


## III.    LEGAL CONTEXT

As noted above, Plaintiffs intend to proceed to trial solely on a strict liability basis under Pennsylvania law arising from an alleged manufacturing defect of the terminal in the Intermatic PowerPack.  While Michael Wald has identified a few possible descriptions of manufacturing defect on such terminal, and the detailed location of such defect, due to the fire itself, he is unable to specifically identify the exact manufacturing defect.

Using Pennsylvania law, Plaintiffs intend to demonstrate this directly and also through circumstantial evidence (often referred to as the "malfunction theory").  This is very typical in fire cases where the fire itself destroys the best direct evidence of the defect.

To prevail on a strict liability claim, a plaintiff must prove that (1) the product was defective; (2) the defect was the proximate cause of the plaintiff's injury; and (3) the defect existed at the time the product left the manufacturer's control. *Barnish v. KWI Bldg. Co.*, 980

A.2d 535, 541 (Pa. 2009); *Dansak v. Cameron Coca–Cola Bottling Co.*, 703 A.2d 489 (Pa. Super. 1997). When a product is destroyed or otherwise unavailable, the plaintiff may prove the existence of a manufacturing defect by circumstantial evidence of a malfunction. *Barnish*, 980 A.2d at 541; see also *Liberty Mut. Fire Ins. Co. v. Sharp Elec*. 2011 WL 2632880, at *3 (M.D. Pa., July 5, 2011); *USAA Cas. Ins. Co. v. Metropolitan Edison Co.,*2014 WL 3943706, *7 (M.D. Pa. August 14, 2014).

Under the malfunction theory, the plaintiff must produce (1) evidence of the occurrence of a malfunction, (2) evidence eliminating abnormal use that would have caused the occurrence, and (3) evidence eliminating reasonable secondary causes for the malfunction. *Walters v. Gen. Motors Corp.*, 209 F.Supp.2d 481, 486–87 (W.D. Pa. 2002); see also *Barnish*, 980 A.2d at 541; *USAA Cas.,* supra*, at *8. Such evidence acts to demonstrate by deductive reasoning that the alleged manufacturing defect caused the injury and that the defect existed when it left the manufacturer's control. *Barnish*, 980 A.2d at 542, *USAA Cas., supra*  at *8. Similar to the doctrine of *res ipsa loquitor*, the malfunction theory merely allows the plaintiff to demonstrate a manufacturing defect through circumstantial evidence rather than direct evidence. *Barnish*, 980 A.2d 542, *USAA Cas., supra*  at *8; *Liberty Mut.*, *supra*, at *3.

That is exactly the necessary proofs that Plaintiffs intend to put on in this case through the factual and expert witnesses.  Direct evidence will demonstrate that the terminal malfunctioned (overheated, melted and failed).  This will be presented to the jury by Michael Wald, and defendants do not contest such opinions – as their experts all agree on these points.

Nonetheless, because of the destruction by the fire itself, no one is able to describe with certainty the status of the terminal (positively or negatively) immediately before the fire or at the time of its manufacture and sale.  Employing the well-accepted malfunction theory, as described

above, Plaintiffs intend to further demonstrate - through Wald's expert testimony - (a) evidence eliminating abnormal use that would have caused the occurrence, and (b) evidence eliminating reasonable secondary causes for the malfunction.  As noted above, such evidence acts to demonstrate by deductive reasoning that the alleged manufacturing defect caused the injury and that the defect existed when it left the manufacturer's control.   Wald will address the first proof above without contest, as the PowerPack and lighting system were not being misused in a way that would have resulted in the malfunction of the terminal.  Wald will address the latter proof above, eliminating secondary causes, by testimony as to why the physical evidence does not support installation error.

It is important to appreciate though that 99% of defendant's complaints about the reliability of Wald's opinion testimony are with regard to his inability to pinpoint or limit the precise defect that led to the malfunction of the terminal and in turn the PowerPack.  In the present "fire destroyed the evidence" context and where the malfunction theory and circumstantial evidence avoid the need to identify a precise defect, these attacks are more clearly seen as parlor tricks by a defense attorney hoping to draw attention to misperceived weaknesses in expert testimony.

Wald's testimony (and the bases for same) – as set forth at great length in response to the motion and above - in addressing the necessary proofs delineated above involves topics he is well qualified to address, is reliable and fits the factual circumstances perfectly.


## IV.    LEGAL ARGUMENT

The Federal Rules of Evidence governing testimony by experts provides as follows:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an

opinion or otherwise, if (l) the testimony is based upon sufficient facts or data; (2) the
testimony is the product of reliable principles and methods, and (3) the witness has
applied the principles and methods reliably to the facts of the case.

Fed. R. Evid.702.

Plaintiffs agree with the general overview as to the *Daubert* evidentiary standards set for
by Intermatic in its motion and memorandum of law.  As noted and demonstrated above, though,
Wald's testimony (and the bases for same) in addressing the necessary proofs delineated above
involves topics he is well qualified to address, is reliable and fits the factual circumstances
perfectly.  Moreover, other courts addressing reliability in this identical contexts have avoided
strict employment of the checklist employed in *Pineda* and *In re Paoli II*.


### A.       WALD'S OPINIONS ARE RELIABLE

Wald's testimony necessary to support the malfunction theory is only contested as to his
opinion negating secondary sources of the malfunction (i.e., that it did not arise from an installer
error).  It is not contested that a malfunction of the PowerPack happened, or that it was not being
used in an improper manner that would have caused this particular malfunction.

Before this Honorable Court turns as requested to the "checklist" often requested in
assessing the reliability of scientific expert testimony, Wald's limited testimony should be
reviewed:

1.       He eliminated installer error based upon his first hand review of the physical
evidence – the destruction of the long leg of the terminal relatively far away from the possible
loose screw connection; the visually tight nature of the stranded wire still tucked up against the
screw for the exterior screw connection; and the absence in his opinion of any melting or arcing
damage on such stranded wires.

2.      He compared these evidentiary observations to his experiences investigating similar (if not identical) fire scenarios over the past 20+ years as a forensic electrical engineering consultant.  He advised that there has never seen nor should there have been any melting down the length of the longer leg of the "L"-shaped terminal resulting from a loose connection generated overheating and failure.  He advised that the stranded wire did not appear in the same manner he had observed prior stranded wire that had been loosely connected to Intermatic products or in similar contexts (both in its thickness and in its character – not suffering melting or arcing damage).

3.      After defendant's own expert had undertaken tests to disprove Wald's opinions negating a loose connection cause, and such expert had published his results (which failed to generate any excessive heat in the longer leg of the terminal, let alone melt it).  Wald noted at his deposition that such failed test results support his opinions based upon his technical knowledge and prior forensic experiences as to why a secondary source did not cause the malfunction.

It is quickly seen that these opinions are so limited and so straightforward that they do not naturally fit into the checklist of factors often used to evaluate speculative or suspect expert testimony.  This Honorable Court would be well-guided to follow the lead of the recent court decision, *USAA Cas. Ins. Co. v. Metropolitan Edison Co., supra¸* addressing necessary *Daubert* analysis in the context of a malfunction theory proof following a fire.  As that court noted:

> Expert testimony is "reliable" when it is based upon sound methodology and technique. *In re Paoli II*, 35 F.3d at 742. The touchstone is whether the expert's methodology is "sufficiently reliable so that it will aid the jury in reaching accurate results." *Id.* at 744. Notably, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process-competing expert testimony and active cross-examination, rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir.2004) (*quoting Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998)); *Kannankeril*, 128 F.3d at 806

("Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined").

The Third Circuit has enumerated several factors to guide the court's reliability inquiry …. *Pineda*, 520 F.3d at 248 (citing *In re Paoli II*, 35 F.3d at 742 n. 8). **This list of factors is a "convenient starting point," but is "neither exhaustive nor applicable in every case."** *Kannankeril*, 128 F.3d at 806–07.   Accordingly, the Rule 702 reliability inquiry is a flexible one, and the factors considered must be applicable to the facts of the case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Following this contextual review of the law, the court was asked to address two reliability arguments similar to those asserted by Defendant Intermatic herein: the general reliability of the support for expert's opinions, as well as the expert's inability to identify a specific defect.

As to the first argument, the *USAA* court noted:

[Defendant] contends that Mr. Simpson cannot support either conclusion by any test, methodology, or examination. The court disagrees. In both reports, Mr. Simpson lists each of the documents and deposition transcripts he relied upon in reaching his conclusions. He also reviewed reference books and standards regarding electrical utility construction and circuit failure modes.  Lastly, Mr. Simpson inspected the remains of the main circuit breaker … and visited the [sites]. Based upon the evidence of record, his examination, and applicable electrical utility standards, Mr. Simpson eliminated other potential causes to arrive at his conclusions. Therefore, the court finds substantial support for Mr. Simpson's methodology.

2014 WL 3943706 at *6.  Mr. Wald supported his opinions with as much bases, if not more.  He reviewed all of the materials as to the products exchanged in discovery; including investigations into prior Intermatic failures; reviewed all of the deposition testimony; referred to his experiential knowledge as to these types of failures, and his knowledge about electrical activity, melting temperatures and many more well-accepted standard.  He personally inspected the remains of the products, visited the sites, and retained the important evidence.  Further, he tested for overloads.  Finally, Wald's opinions were validated by defendant's expert's inability to recreate the distinguishing characteristics through laboratory tests.

The *USAA* court further addressed the expert's inability to identify a specific manufacturing or assembly defect in the subject product affected by the resultant fire.  The court noted that

> Finally, [Defendant] asserts that Mr. Simpson's opinion is fatally flawed because he failed to find any defect in the main circuit breaker. This argument is also unpersuasive. As set forth [below], [Plaintiff] may use circumstantial evidence of a malfunction to prove a manufacturing defect. Utilizing the malfunction theory, Mr. Simpson need not identify any specific defect in the main circuit breaker.

*Id.* at *6-7.  The same applies equally if not greater to Wald's opinions here – as they are not entirely based on circumstantial evidence.  There is direct evidence of a failure of the long leg of the terminal that cannot be explained by any other cause other than inherent defect.

Despite these reliability supports expressed by other courts, Defendant Intermatic attacks Wald's opinions in standard fashion.  They argue that he conducted no tests and that his opinions are not peer-reviewed and his results are not quantifiable.  Frankly, I am not sure the contexts in which litigation experts' case-specific opinions would be peer-reviewed, or when forensic electrical engineering reviews of burnt evidence would be quantifiable.  These are not standards applicable in this context.

Defendant Intermatic continues its parlor games by criticizing Wald for not being able to identify the size of the melted "crack" or "bubble" or other anomaly or to describe its shape, form or dimensions or its exact location on the terminal, etc., etc.

In an attempt to undermine his straightforward opinions, Defendant falsely claims that his testimony and his expert report contradict each other.  These were mostly in the area of pigeon-holing the exact defect and slight differences and word usages in the different contexts.  They are addressed on Plaintiff's response in detail, and form no basis to undermine Wald's pertinent testimony in the malfunction theory context – negating secondary sources.

Defendant makes an uncited and untrue allegations that "Wald possesses no experiential foundation for offering his opinion that, because he has never seen a case where a brass terminal melted because of improper installation (which he admitted is an alternative explanation and the opinion of the cause of the fire from Intermatic's experts)"  To the contrary, Wald discussed investigating numerous loose connection failures (in Intermatic and other products), and how the heat from the poor connection can lead to melting of the terminal in the immediate proximity of the loose connection.  Wald testified: "The difference is if you had an overheating loose connection, you melt the metal at the connection, and the connection separates and we're done. And you don't see what we have here [melting far from the connection].  Whereas, if the melting is due to a defect in the material, you melt at the location of the defect, which is what we see here. This case is extremely simple."  Wald Deposition, pp. 254-55 (Exhibit "A").

Defendant reiterates its inane and specious assertion levied in paragraphs 52 and 53 of its motion in which it wrongly criticizes Wald for never having been asked to address an overly specific set of facts that match up with this case – a limited cross-sectional effect on a terminal (not any other form of metal conductor) carrying a precisely 12 volt circuit (not a higher or lower volt circuit).  Plaintiffs ask that the court refer to the details set forth in Plaintiffs' responses thereto in its response, and dismiss such frivolity out of hand.

As the Third Circuit Court of Appeals noted in *United States v. Mitchell, supra*: "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process-competing expert testimony and active cross-examination, rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." 365 F.3d at 244 (3d Cir. 2004).  That applies perfectly to

the testimony provided by Wald to necessarily negate the possibility of a secondary source (a loose initial connection 6 years earlier) for the malfunction.

### B.      WALD'S OPINIONS ARE RELIABLE UNDER *DAUBERT* PROGENY

Defendant Intermatic takes a few more swipes at the same alleged deficiencies in an additional section of its motion.  It asserts that Wald's opinions also fail to meet other important "factors relevant in determining whether expert testimony is sufficiently reliable to be considered."   Defendant then mentions criteria that have nothing relevant to do with the context of this case:  "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;" and whether the experts conclusions "could reliably flow from the facts known to the expert and the methodology used."[3]

Defendant than repeats all of its identical prior complaints and tries to package them inartfully up against these irrelevant and inapplicable standards.  These arguments can again be dismissed out of hand.

### C.      WALD'S OPINIONS ARE RELIABLE AND IN ACCORD WITH FIRE          INVESTIGATIVE STANDARDS

Defendant Intermatic then tries to contrast Wald's opinions fire investigative guidelines set forth in NFPA 921 (2011).  In furtherance of Chapter 4 of NFPA 921, a fire investigator is guided to approach an investigation systematically, analyze the data and apply the scientific method.  It is denied that, as Defendant notes or implies, the scientific method employed in the

---

[3]  These criteria and the citations from where they were derived are actually "fit" criteria more than reliability criteria.  It makes no difference, but Plaintiffs want to put these criteria in their proper context.

guidebook (or elsewhere for that matter) requires "testing" – at least in the physical sense.

NFPA 921 (2011), Chapter 4, as attached (in part) to Defendant's Motion as Exhibit "F" does not

require physical testing of all hypotheses.  In fact, section 4.3.6 (entitled "Test the Hypothesis

(Deductive Reasoning)") recommends that any inductive reasoning that led to possible fire

causes be subjected to deductive reasoning to limit the multiple possible causes:

> Testing of the hypothesis is done by the principle of deductive reasoning, in which the
> investigator compares his or her hypothesis to all the known facts as well as the body of
> scientific knowledge associated with the phenomena relevant to the specific incident. A
> hypothesis can be tested either physically by conducting experiments <u>or analytically by</u>
> <u>applying scientific principles in "thought experiments."</u> … If the hypothesis cannot be
> supported, it should be discarded and alternate hypotheses should be developed and
> tested. … The testing process needs to be continued until all feasible hypotheses have
> been tested and one is determined to be uniquely consistent with the facts, and with the
> principles of science. If no hypothesis can withstand an examination by deductive
> reasoning, the issue should be considered undetermined.

NFPA 921 (2011), 4.3.6, (Defendant's Exhibit "F").

Wald testified that he prepared his report in accordance with NFPA guidelines and the

scientific method.  Wald did arrive at only three possible hypotheses for the cause of the fire –

inherent defect, installation error and overloading.  All investigators promptly discounted the

"overloading with improper lights or other loads" hypothesis.  Further, through Wald's analysis

of the physical evidence (including the location of the melted terminal relatively far away from

the terminal connection) he was not just able to, <u>but required to</u>, eliminate the installation error as

a potential cause, leaving only one feasible hypothesis – inherent manufacturing defect.  This

was not in violation of NFPA 921, but instead in perfect conformity with it.

It is admitted that according to NFPA 921, the "most likely cause of the overheating <u>at a</u>

<u>connection </u>will be a loose connection or the presence of resistive [not "restive"] oxides at the

point of connection." NFPA 921 (2011) 8.10.4.  No one is doubting this well-accepted forensic

statement.  The relevant issue here though is whether such alleged overheating loose connection

could have caused the melting of the terminal relatively far away from the allegedly overheating

loose connection.  Further, the overheating noted on this terminal was not at a connection point,

so analysis as to such issue is not guided at all by this well-accepted forensic statement.  That is

in fact at the heart of the anomaly here – the terminal melted not at or near a connection point,

but instead at a point in the middle of what would otherwise be its thickest breadth and longest

length – and far from a connection point.

> **D.    ONLY ONCE IN WALD'S 20+ YEAR CAREER HAS AN OPINION HE
> EXPRESSED BEEN PRECLUDED UNDER A *DAUBERT* ANALYSIS AND
> IT IS IRRELEVANT AND IMPERTINENT TO THIS COURT'S
> DECISION HERE**

Defendant takes its gratuitous and irrelevant swipe at Wald – when all else fails by -

alerting the court to the one prior decision where Wald's opinion testimony was precluded (and

then upheld on appeal).  *Fîreman's Fund Ins. Co. v. Canon U.S.A., Inc.*, (8th Cir. 2005).  The

Defendants do not cite to the two published decisions where Wald's testimony was not precluded

after a *Daubert* review.  *Stone & Alter Real Estate Co. v. Hobart Corp.*, 2003 WL 25694932

(E.D. Mo., East. Div. Mar. 18, 2003); *Seeley v. Hamilton Beach/Proctor-Silex, Inc.,* 349

F.Supp.2d 381 (N.D. N.Y.  2004). All these decisions involve markedly different facts and

circumstances from each other, as well as from the facts of this case.  Nonetheless, after

inappropriately referring to this inapplicable prior decision, Defendant again repeats all its prior

complaints and tries to vaguely comport them to the issues raised by the appellate court in

*Fireman's Fund*.  The arguments were unsupportable on their own and are unsupportable when

again raised for a third time standing next to the *Fireman's Fund* decision.

A few actual distinguishing points are in order.  In *Fireman's Fund*, the origin of a fire

was in dispute and the defendant did not agree – as it has here - that its product had

malfunctioned.  So as to ensure that practitioners did not read the *Fireman's Fund* case as

requiring tests to support expert testimony, the United States Court of Appeals for the 8th Circuit clarified its statements in *Fireman's Fund* xxx years later in *Shuck v. CNH America, LLC,* 498 F.3d 868 (8th Cir. 2007) (expert testimony need not be supported by testing; *Fireman's Fund* stands for general proposition that - if performed – testing must be appropriate and must actually prove what experts claim it proves).

Such decisions have no bearing on the pending motion.


**E.     WALD'S OPINIONS PERFECTLY "FIT" THE FACTS AND EVIDENCE**

The court should dismiss out of hand any argument that Wald's opinions do not have the proper fit for the facts and circumstance of this case.  Defendant doth protest too much.

This category of "fitness" is to ensure that experts are incorporating opinions that coincide with the empirical facts of the specific case, and/or that the facts of the case support similar findings.  The present case is a very fact sensitive and physical evidence sensitive matter and all of Wald's focus is on the facts of this matter and how they play out to suggest or prevent the happening of the specific product's malfunction.


**F.     *DAUBERT* HEARING**

Defendant suggests that the court engage in a hearing as to the issues batted about in the pending motion.  If the court is in any way swayed by Defendant's overly aggressive and unsubstantiated arguments, then Plaintiffs respectfully request that this Court undertake a *Daubert* hearing before entering any order precluding Wald's testimony in order to better allow the court to focus on the actual issues involved.  Nonetheless, Plaintiffs feel that such a request is otherwise unnecessary and that the matter should proceed to trial.

**V. CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that this

Honorable Court deny Intermatic's Motion to Preclude Testimony of Michael Wald, as well as

those of other defendants that simply adopt Intermatic's arguments.


**Respectfully Submitted,**

**de LUCA LEVINE, LLC**


**Dated:** <u>December 5, 2014</u>          **BY:**   ***Kenneth T. Levine***              

                                                   Kenneth T. Levine, Esquire
ATTORNEYS FOR PLAINTIFFS
PA Atty. I.D. No. 60984
Three Valley Square, Suite 220
Blue Bell, PA    19422
(215) 383-0081
(215) 383-0082 (fax)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DONALD DALTON AND LORIS DALTON, H/W AND ERIC DALTON AND SANDI DALTON, H/W** <br>         **Plaintiffs** <br><br> **vs.** <br><br> **McCOURT ELECTRIC LLC and INTERMATIC, INC.** <br>         **Defendants** | **Civil Action No: 2:12-CV-03568-JP** <br><br> <u>**CERTIFICATE OF SERVICE**</u> |

I, Kenneth T. Levine, Esquire, hereby certify that on the date indicated below, I electronically filed the foregoing with the Clerk of the Court for the USDC for the EDPA by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                         **de LUCA LEVINE, LLC**

**Dated:** <u>December 5, 2014 </u>    **BY:**   <u>***Kenneth T. Levine***            </u>
                                            Kenneth T. Levine, Esquire
                                            ATTORNEYS FOR PLAINTIFFS
                                            PA Atty. I.D. No. 60984
                                            Three Valley Square, Suite 220
                                            Blue Bell, PA   19422
                                            (215) 383-0081
                                            (215) 383-0082 (fax)