IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONALD DALTON, et al., | : | CIVIL ACTION |
| | : | NO. 12-3568 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MCCOURT ELECTRIC LLC, et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    July 7, 2015

This case sparked to life with a fire that occurred in the home of Donald and Loris Dalton ("Plaintiffs") and caused substantial losses to their real and personal property--losses Plaintiffs attribute to both Intermatic, Inc. ("Intermatic"), the company that manufactured certain electronic components involved in this case, and McCourt Electric, LLC ("McCourt"), the contractor that installed said components.[1] Plaintiffs brought suit against Intermatic and McCourt, and Intermatic filed a Daubert motion to exclude Plaintiffs' liability expert, Michael Wald. For the reasons that follow, the Court will deny the Daubert motion to exclude Mr. Wald's expert testimony at trial.

---

[1]      Plaintiffs reached a confidential joint tortfeasor settlement with McCourt in November 2013--although McCourt technically remains a party to the action. See Pls.' Mem. Supp. Resp. Mot. Summ. J. 4, ECF No. 110.

## I.   FACTUAL BACKGROUND[2]

After Mr. and Mrs. Dalton purchased their home in the spring of 2006, see Daubert Mot. Ex. B, Donald Dalton Dep. 26:10-24, May 28, 2013, ECF No. 98 [hereinafter Dalton Dep.], Mr. Dalton purchased four Intermatic ML600TW Power Packs ("Power Packs")--devices used to reduce current for low-level exterior lighting, see Daubert Mot. ¶ 5--for Leslie McCourt ("Mr. McCourt") to install. See Dalton Dep. 58:2-8. Without opening the packaging containing the Power Packs or examining their contents, Mr. Dalton simply left them in his basement until Mr. McCourt arrived to install them. Id. 58:13-21.

Mr. McCourt installed each Power Pack in the basement and connected the wires[3] for the Power Pack that is the subject of the instant litigation, while Mr. Dalton connected the wires to the other three Power Packs. Id. 67:16-68:20. When Mr. Dalton connected the wiring on the three Power Packs he set up, he reviewed the instructions regarding the wattage capacity limits of the Power Packs on the outside of the box that contained the Power Packs, but he did not read any material found inside the

---

[2]      The following undisputed facts are drawn from Plaintiffs' Amended Complaint, Defendants' Daubert motion, and Plaintiffs' response to said motion.

[3]      Mr. McCourt connected the wires of the Power Pack to the "up-lights" that shined upon the exterior of the house. See id. 34:17-35:9, 67:21-68:6.

box. Id. 81:2-82:9. Until 2012, Mr. Dalton did not experience any issues with the functioning of the Power Packs. Id. 83:14-84:10.

On March 9, 2012, however, Mr. Court was startled by the sound of the smoke alarms going off in his house, and by the discovery of smoke emanating from the basement. Id. 102:10-16, 106:7-107:6. Upon entering the basement, Mr. Dalton observed sparks and flames in the area around the subject Power Pack. Id. 107:14-108:5. Ultimately, the fire "resulted in substantial injury and loss as to the Plaintiffs' real and/or personal property." Am. Compl. ¶ 7, ECF No. 38.

Soon after the incident, Plaintiffs retained the services of Mr. Wald of IEI Consulting, Inc., to determine the cause of the fire. See Daubert Mot. Ex. C, Wald Report 1 [hereinafter Wald Report]. Based on his examination of the site on April 6, 2012, Daubert Mot. Ex. D, Michael Wald Dep. 89:5-21, July 22, 2014 [hereinafter Wald Dep.], and on his artifact inspection on May 21, 2012, id. 93:2-95:11, Mr. Wald opined that there "were no other electrical failures which could have caused this fire other than the failure at the load terminal of the timer." Wald Report 1.

In describing why he found said cause "quite clear," Mr. Wald observed that "the section of metal bus that connects one leg of the transformer output to one of the screw terminal connections suffered a prolonged arcing failure." Id. at 2.

3

According to Mr. Wald, "Arcing failures not only generate local temperatures in the 3000-5000 degree Fahrenheit range, they also produce molten metal which can drop onto combustible materials below and ignite a fire. This is what happened in this incident." Id.  Mr. Wald laid out his reasoning in greater detail in the following portion of his report:

> The arcing event that occurred only involved one leg of the transformer output. Thus, the cause of this damage is what is known as in-line arcing. In-line arcing occurs when a conductor breaks while current is being drawn through it and electrons jump (arc) from one side of the break to the other. The arc produces plasma and the nearby burning plastics produce carbon. Both of these cause a conductive atmosphere such that the arc can continue, consuming portions of the conductor as it travels. That is why a section of the terminal bus is consumed. This bus broke while the landscape lights were operating and arcing occurred. The possibility that there was a loose connection at the screw terminal that caused this arcing can positively be eliminated since there is no arcing or even melting at the stranded wiring at the screw terminal. Thus it is concluded that the failure originated in the section of bus below the screw terminal end.
>
> This section of bus is part of the original construction of the timer. There is no evidence that any excessive electrical loads were placed on this bus since all of the downstream wiring and lights were in good operating condition. Therefore it must be concluded that this bus was in a damaged condition when this product was manufactured and sold. The cross sectional area of the bus was so small that the bus separated while only carrying a small load. Some defect in this material must have existed, possibly a crack or a bubble in the metal, or else the metal was damaged during manufacture and assembly by Intermatic, to ultimately result in this internal failure. It is noted that this failure occurred in the area where the bus turns (is bent) 90 degrees from horizontal to

4

> vertical which would be a likely place for a crack to
> form.

Id.

On July 22, 2014, and October 8, 2014, the parties
conducted Mr. Wald's expert deposition. See Wald Dep. 1:11,
171:11. Prior to the first session of his deposition, Mr. Wald
was instructed to bring "[h]is entire case file and all
materials in his possession regarding the above matter, including
all artifacts"; prior to the second session, the instruction was
elaborated to request materials "includ[ing], but [] not limited
to, all literature, studies, testing, evidence and documentation
of testing, that support the opinions and conclusions [Mr. Wald]
has offered, and any and all other documents and materials, by
whatever name known, that Mr. Wald contends support his opinions
and/or conclusions and report(s) in this matter." Daubert Mot.
Ex. E, Dep. Notices.

On each occasion, Mr. Wald testified that he brought
the entire contents of his file, see Wald Dep. 8:23-15:23,
178:20-179:21--except for a "little diagram of the [Dalton's]
house" that he could not find, which he thought did not have
"any real relevance," id. 15:5-23. Mr. Wald's file included,
inter alia, his "current bio," billing records, photographs, his
investigative reports on the fire, and "a CD of all the
electronic files that were transmitted to [him]" in connection

with this case. Id. 10:24-11:16. Mr. Wald did not bring any
notes--as he claimed he had not taken any during the course of
his investigation, either by hand or electronically, id. 15:24-
16:15--nor did he provide any testing results or industry
literature that he relied upon in his investigation. Accordingly,
Mr. Wald confirmed that the sole bases for the opinions contained
in his report were the photographs, his own observations, his
past forensic work, and well-established and thoroughly tested
principles of science, rather than any further experimentation
or consultation of literature or standards. See id. 106:13-109:5.

## II.  PROCEDURAL HISTORY

Plaintiffs filed a complaint on June 25, 2012,
asserting the following claims: (1) negligence by Intermatic
(Count I); (2) negligence by McCourt (Count II); (3) strict
products liability against both Intermatic and McCourt (Count
III); (4) breach of implied warranties against Intermatic (Count
IV); and (5) breach of implied warranties against McCourt (Count
V). Compl. ¶¶ 13-40, ECF No. 1. On March 19, 2013, Magistrate
Judge Thomas J. Rueter permitted Plaintiffs to file an amended
complaint to add a claim of interference with enjoyment of real
property. ECF No. 37; see Am. Compl ¶¶ 16, 21, 31, 37, 44. On
December 5, 2015, however, Plaintiffs stated that "[w]hen [they]
proceed to trial in this matter they will be limiting their

claims . . . [to] assert a claim only against defendant
Intermatic on a claim for strict product liability." Pls.' Resp.
Mem. 8, ECF No. 115.[4]

Intermatic filed a motion for summary judgment (ECF
No. 99), as well as a <u>Daubert</u> motion to preclude Plaintiffs'
liability expert, Mr. Wald, from testifying (ECF No. 98).
Intermatic also filed a third-party complaint on December 17,
2013, which alleges that Deltran Corp. ("Deltran") manufactured a
defective component part of the Intermatic device that allegedly
caused the fire.[5] ECF No. 59. Deltran in turn filed a fourth-
party complaint against Thyssen Krupp Materials NA ("Thyssen")
on March 20, 2014, which asserts that liability should shift to
Thyssen, as the supplier of the brass used in the allegedly
defective component of the Power Pack. ECF No. 75. In response
to Deltran's fourth party complaint, Thyssen filed a motion for
summary judgment or, in the alternative, a motion for leave to
file a fifth-party complaint against a company named PMX
Industries. ECF No. 102. In the motion, Thyssen asserts that it
was prejudiced by the fact that Deltran failed to provide timely

---

[4]      As the pages of Plaintiffs' response are not numbered,
the Court will refer to the page numbers imposed by ECF.

[5]      According to Plaintiffs' expert report, the device
that caused the fire was an "Intermatic Power Pack," which is a
small power source that can be used to power light timers.
Deltran allegedly manufactured the "load terminal" and "load bus"
contained in the Power Pack. <u>See</u> Third Party Compl. ¶¶ 10, 13,
ECF No. 59.

information indicating that PMX Industries may have actually
supplied the brass to Deltran. Both Deltran and Thyssen have
joined Intermatic's Daubert motion. ECF Nos. 101, 103. The Court
held a hearing on the motion for June 8, 2015. The Defendants'
Daubert motion is ripe for disposition

## III. LEGAL STANDARD

Federal Rule of Evidence 702, which governs the
admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify
> in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact
> to understand the evidence or to determine a fact
> in issue;
>
> (b) the testimony is based on sufficient facts or
> data;
>
> (c) the testimony is the product of reliable
> principles and methods; and
>
> (d) the expert has reliably applied the
> principles and methods to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the
Supreme Court described the gatekeeping role district courts
play under Rule 702 in "ensur[ing] that any and all scientific
testimony or evidence is not only relevant, but reliable." 509
U.S. 579, 589 (1993). When "[f]aced with a proffer of expert
scientific testimony . . . the trial judge must determine at the

outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. This gatekeeping function "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

As interpreted by the Third Circuit, Rule 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000). The proponent of the expert testimony bears the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. See Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999). The Third Circuit has emphasized that not only do the Rules of Evidence generally "embody a strong preference for admitting any evidence that may assist the trier of fact," but Rule 702 specifically "has a liberal policy of admissibility." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)) (internal quotation marks omitted).

The first requirement, whether the witness is qualified as an expert, has been interpreted liberally to

encompass "a broad range of knowledge, skills, and training." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). Under the second requirement, that of reliability, when the expert testifies to "scientific knowledge," the expert's opinions "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Id. at 742 (quoting Daubert, 509 U.S. at 590). In considering whether there are "good grounds" for the expert's opinions, courts often look to a number of factors, such as:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Id. at 742 n.8. This list of factors "is non-exclusive," however, and "each factor need not be applied in every case." Elcock, 233 F.3d at 746. As the Supreme Court in Kumho Tire noted, the district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of

expert testimony." 526 U.S. at 152.

The final prong of the Third Circuit's Rule 702 analysis requires that the expert testimony "'fit,' in that it must assist the trier of fact. Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (citation omitted) (quoting In re Paoli, 35 F.3d at 743). The Third Circuit has stressed that

> [t]his ["fit"] standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs 'to prove their case twice--they do not have to demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that they are reliable."

Id. (quoting In re Paoli, 35 F.3d at 744). This "fit" requirement essentially means that "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case." In re Paoli, 35 F.3d at 743.

## IV.  DISCUSSION

In their Daubert motion, Defendants do not contest Mr. Wald's qualifications; rather, they challenge the reliability and fit of his testimony. The Court will treat each point in turn.

A.  Reliability

Defendants assert that "[d]ue to the lack of methodology in the formulation of his expert report . . . and the opinions contained therein, and the ipse dixit[6] nature of those opinions, any testimony at trial on the part of Wald is unreliable and unfit for presentation to a jury in this matter." Daubert Mot. ¶ 1. Thus, Defendants conclude, Mr. Wald's testimony must be excluded. The Court is not persuaded.

Upon his investigation of the evidence, Mr. Wald determined that there were only three hypotheses that could explain the fire's cause: (1) "an inherent manufacturing defect of the terminal components . . . eventually malfunctioned"; (2) "a loose or otherwise improper connection made by the installer McCourt Electric to the terminal 6 years earlier . . . eventually resulted in the overheating of the connection and the malfunction of the product"; or (3) "the Power[ ]Pack, wiring[,] and components were overloaded with improper bulbs or other electrical elements downstream." Pls.' Resp. Mem. 2. Plaintiffs note that "these were the only three hypotheses suggested, proposed, addressed or rebuked by any of the parties or their experts to explain this malfunction"--and the third hypothesis "was reviewed by Wald and defendant's expert and disregarded as the load was deemed well within proper limits." Id. at 2 n.1.

---

[6]        Latin for "he, himself, said it."

12

Defendants do not dispute this.

The components in question "are all internal to the Power[ ]Pack and cannot be viewed unless the Power[ ]Pack is disassembled." Id. at 3. The five components consist of: (1) internal wiring affixed to a (2) screw that is connected to the end of the long side of an (3) L-shaped brass terminal, on the short side of which is another (4) screw that is clamped down on (5) external wiring that leads out of the Power Pack. See id. The melting that occurred in connection with the subject fire completely consumed half of the long side leading up to the ninety degree bend of the terminal--including the bend area itself--as well as much of the short arm of the terminal. See id. Thus, the Court is confronted with two proffered possible causes of the fire, mere millimeters apart: either a manufacturing defect existed in metal of the long side or near the bend of the terminal, or installer error occurred in the affixing of the wire with the screw on the short side of the terminal. Plaintiffs and their expert assert the former; Defendants and their experts the latter.

In essence, Defendants' argument is summed up in their claim that "the methodology used by Wald to arrive at his opinions in this case satisfies almost none of the[] factors" laid out by the Third Circuit in In re Paoli:

(1) testable hypothesis--he has not performed any

13

testing and his lack of testing disproves his
conclusion; (2) peer review--not performed; (3) known
or potential rate of error--none offered and/or is
unknown; (4) standards controlling the technique's
operation--none; (5) method is generally accepted--no
such evidence exists; (6) relationship of the
technique to methods which have been established to be
reliable--not shown.

Defs.' Br. Supp. Daubert Mot. 12, ECF No. 98 [hereinafter Defs.'
Br.]. The Third Circuit has offered these factors to guide a
court's reliability inquiry under Daubert; however, the Third
Circuit has also emphasized that although said list of factors
is a "convenient starting point," it is "neither exhaustive nor
applicable in every case." Kannankeril, 128 F.3d at 806–07.

In reaching his conclusion, Mr. Wald reviewed the
physical evidence, inspecting the remains of the products and
examining the site of the fire. Importantly, Mr. Wald eliminated
the possibility of installer error--at least in his opinion--in
his examination of the evidence, given such factors as the
destruction of the long side of the terminal (relatively far
from the screw connection that Defendants allege was loose), see
Wald Dep. 126:6-18, the "visibly tight" nature of the stranded
wire still tucked up against the exterior screw connection, id.
98:11-99:24, and the absence of substantial melting or arcing
damage on the stranded wires, see Wald Report 2.

Thus, although Mr. Wald's ability to test his own
defect hypothesis was limited by the destruction of the very

evidence that might have supported it, he could also support his conclusion by ruling out the only other available theory of loose wiring installation. In his own words, Mr. Wald avowed that he applied the scientific method[7] in "identify[ing] the potential sources of ignition in [the] area, . . . eliminat[ing] the ones that can be eliminated, and if you are left with one, then you have identified the source of ignition for the fire." Wald Dep. 109:14-18. Given the exceedingly narrow range of possible causes in this case, and in light of the evidence Mr. Wald cited against the "loose-connection theory," the Court finds the logic of his method to be sound.

Notably, according to what is termed the "malfunction theory," the Plaintiffs are not required to prove the precise nature of the alleged defect. To prevail on a strict liability claim under Pennsylvania law, a plaintiff must prove that (1) the product was defective; (2) the defect was the proximate

---

[7]     Although Defendants assert that Mr. Wald failed to proceed in accordance with the National Fire Protection Association ("NFPA") standard set forth in NFPA 921, the Court finds that Mr. Wald adequately took a "systematic approach" and applied the "scientific method" in his investigation. Daubert Mot. Ex. F., NFPA 921 §§ 4.2-4.3. Indeed, Defendants' dismissiveness of Mr. Wald's reliance on "deductive reasoning," see Defs.' Reply Br. 3, ECF No. 117, is somewhat at odds with NFPA 921's own affirmation of the important role deductive logic plays in the scientific method. See Daubert Mot. Ex. F., NFPA 921 § 4.3.6. Moreover, § 4.3.6 recognizes that "[a] hypothesis can be tested either physically by conducting experiments or analytically by applying scientific principles in 'thought experiments.'" Id.

cause of the plaintiff's injury; and (3) the defect existed at the time the product left the manufacturer's control. Barnish v. KWI Bldg. Co., 980 A.2d 535, 541 (Pa. 2009). However, when a product is destroyed or otherwise unavailable--as is often the case with fire damage--the plaintiff may prove the defect's existence by circumstantial evidence of a malfunction. Id. Under the malfunction theory of product liability, the plaintiff must produce (1) "evidence of the occurrence of a malfunction," (2) "evidence eliminating abnormal use," and (3) evidence eliminating "reasonable[] secondary causes for the malfunction." Id. (quoting Rogers v. Johnson & Johnson Prods., Inc., 565 A.2d 751, 754 (Pa. 1989) (internal quotation marks omitted)). Evidence supporting this theory relieves the plaintiff from the obligation to pinpoint the precise defect, and indicates that the alleged defect both caused the injury and existed when the product left the manufacturer's control. See id. at 542. This malfunction theory closely aligns with the approach Mr. Wald took in his investigation.

        In reaching his conclusions, Mr. Wald drew upon "his experiences investigating similar . . . fire scenarios over the past 20+ years as a forensic electrical engineering consultant." Pls.' Resp. Mem. 12. Mr. Wald testified that, over the years, he has performed a number of arcing damage experiments involving metal objects with degraded cross-sectional areas--and he has

16

observed melting and arcing results similar to what he believes occurred in this case. Wald Dep. 145:7-147:10. Defendants concede that "[e]xperience may provide a sufficient foundation for expert testimony," but they are mistaken in their claim[8] that he simply "aver[red] conclusionarily that his experience led to his opinion." Defs.' Reply Br. 5 (emphasis omitted). Mr. Wald clearly described his prior experiences with loose-connection damage, and he laid out the reasons why the instant situation "does not look like one would expect it to look like if it were a loose terminal connection." Wald Dep. 149:13-15; see also id. 147:11-151:8.

At best, misunderstanding Mr. Wald's testimony--and at worst, mischaracterizing it--Defendants assert that his explanation of a "prolonged arcing failure," Defs.' Br. 14, was later contradicted[9] by his statement that "arcing is not--plays

---

[8]    Defendants point out that Mr. Wald has never seen a case of arcing damage with current levels as low as those involved here. See Defs.' Br. 11. Thus, Defendants argue that "Wald possesses no experiential foundation" for his opinion. Id. This is simply untrue, however, as Mr. Wald testified that he has (1) observed arcing damage under similar conditions and has (2) seen many instances of what loose-connection damage looks like. Surely this provides a relevant experiential foundation, even if he has never confronted these exact circumstances before.

[9]    Defendants also assert that Mr. Wald first opined that the defect was on the terminal's bend, but later contradicted himself and said it was somewhere in the middle of the long side of the terminal. Defs.' Br. 10. However, Mr. Wald actually said he believed that the defect was "somewhere near [the] bend."

no real significant role in any of this we're talking

about. . . . It doesn't play any significant role in this event

at all." Wald Dep. 254:9-14. Contrary to Defendants' claim that

this shows that "Wald's opinion as to the cause of the fire has

changed," Defs.' Br. 14, the plain text of the notes of Mr.

Wald's testimony reveals otherwise.[10] Rather than changing his

story, Mr. Wald was remarking that regardless of whether there

was a defect in the metal or a loose wiring connection, metal

melted and arcing inevitably occurred with the current running

---

Wald Dep. 122: 15-22 (emphasis added). These statements are
easily reconciled, and do not render his opinion unreliable.

[10]        In context, the passage reads as follows:

>      Again, just to help you, hopefully, arcing is
> not--plays no real significant role in any of this
> we're talking about. It is a fact that whenever you
> part conductors there will be a parting arc. It's
> defined in NFPA 921. It doesn't play any significant
> role in this event at all.

>      You and I agreed two hours ago that the
> explanation for this fire is either a loose connection
> or a defect in the material. They both produce the
> same result. You overheat the material. They both
> produce molten metal.

>      The difference is if you had an overheating loose
> connection, you melt the metal at the connection, and
> the connection separates and we're done. And you don't
> see what we have here.

>      Whereas, if the melting is due to a defect in the
> material, you melt at the location of the defect,
> which is what we see here. This case is extremely
> simple.

Wald Dep. 254:8-255:4.

through the molten metal. The arcing itself is not the point; the question is why it occurred.

Finally, Defendants point to <u>Fireman's Fund Insurance Co. v. Canon U.S.A., Inc.</u>, 394 F.3d 1054 (8th Cir. 2005), "the one prior decision where Wald's opinion testimony was precluded (and [the exclusion of his testimony was] upheld on appeal)," Pls.' Resp. Mem. 18. However, the instant case is distinguishable from <u>Fireman's Fund</u>--where, unlike here, the court found that Mr. Wald had not "proposed a specific defect." 394 F.3d at 1059.[11]

Further, contrary to Defendants' claims, Mr. Wald did develop a "testable hypothesis"--albeit one understandably limited by the destruction of the evidence--by applying the "generally accepted" method of using deductive reasoning to narrow down alternative explanations. <u>See</u> <u>Daubert</u> Mot. Ex. F., NFPA 921 § 4.3.6. Defendants argue that Mr. Wald "did not perform any test or experiment to determine the feasibility of a 'prolonged' 'in-line' arcing failure in a brass-coated terminal that conducts 15 amperes of current from a twelve volt (12V)

---

[11]     In the instant case, Mr. Wald proposed a specific defect: a cross-sectional area of the long side or bend of the terminal with insufficient mass to support the current running through it. He merely could not describe the precise location or appearance of the defect as a result of the damage.

source"--testing that Mr. Wald admitted was feasible.[12] However, Mr. Wald found that such testing was unnecessary, as the occurrence of melting and arcing as a result of electrical current running through an insufficient cross-sectional area of metal is already a well-established phenomenon. <u>Daubert</u> Hrg. Tr. 33:1-14. Even if conducting a particular test may have rendered the opinion "more" reliable, that does not mean that without it, the opinion is unreliable. The Court finds that, under these circumstances, this criticism goes to the weight of Mr. Wald's opinion and not its reliability.

Although a consulting electrical engineer's case-specific forensic evaluation may not neatly fit into all of the elements the Third Circuit has discussed in the context of <u>Daubert</u> analysis, the Third Circuit has also stressed that "[a]s long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process--competing expert testimony and active cross-examination--rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily

---

[12] Although counsel for Intermatic pointed out that § 4.3.6.1 of NFPA 921 states that "[a]ny hypothesis that is incapable of being tested is an invalid hypothesis," <u>Daubert</u> Hrg. Tr. 70:3-12, Mr. Wald recognized that his hypothesis was readily testable--he simply argued that such testing would be pointless, as the principles underpinning his hypothesis have already been so thoroughly tested and universally established, <u>see</u> <u>id.</u> 33:1-14.

weigh its inadequacies." United States v. Mitchell, 365 F.3d
215, 244 (3d Cir. 2004) (quoting Ruiz-Troche v. Pepsi Cola of
P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)). Defendants
have highlighted several alleged shortcomings that a jury would
need to weigh carefully. Regardless, Mr. Wald's testimony is
based on good enough grounds, and it should not be discarded
because Defendants judge that it would have been "more" reliable
with additional testing. Accordingly, the Court finds that Mr.
Wald's expert testimony is sufficiently reliable under Daubert
and Rule 702, and further concerns may be adequately addressed
during cross-examination at trial.

B.   Fit

For essentially the same reasons Defendants raised in
challenging Mr. Wald's reliability, Defendants argue that his
principles and methods "do not fit the facts and evidence in
this case." Defs.' Br. 17. As mentioned earlier, however, the
"fit" standard is not a high one, Oddi, 234 F.3d at 145, and the
Court finds that Mr. Wald's "proposed testimony [not only]
constitutes scientific knowledge," but constitutes "scientific
knowledge for purposes of the case," In re Paoli, 35 F.3d at 743.
Mr. Wald's testimony would adequately "assist the trier of fact,"
Oddi, 234 F.3d at 145; thus, it will not be excluded as unfit.

**V.    CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' <u>Daubert</u> motion. An appropriate order follows.