```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD DALTON, et al.,            :    CIVIL ACTION
                                  :    NO. 12-3568
        Plaintiffs,               :
                                  :
    v.                            :
                                  :
MCCOURT ELECTRIC LLC, et al.,     :
                                  :
        Defendants.               :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              August 5, 2015

On March 9, 2012, a fire occurred in the home of Plaintiffs Donald and Loris Dalton ("Plaintiffs") and caused substantial losses to their real and personal property--losses Plaintiffs attribute to both Defendant Intermatic, Inc. ("Intermatic"), the manufacturer of the electronic device at issue in this case, and Defendant McCourt Electric, LLC ("McCourt"), the contractor that installed said device.[1]

Plaintiffs brought suit against Intermatic and McCourt, after which ensued a cascade of products liability denials and imputations. Intermatic filed a third-party complaint against Deltran Corp. ("Deltran"), the manufacturer of an allegedly defective component of the device; Deltran filed a

---

[1] Plaintiffs reached a confidential joint tortfeasor settlement with McCourt in November 2013--although McCourt technically remains a party to the action. See Pls.' Resp. 4.

fourth-party complaint against Thyssen Krupp Materials NA ("Thyssen"), the supplier of the brass used in the allegedly defective component of the device. Intermatic filed a motion for summary judgment, which was joined by both Deltran and Thyssen. Thyssen filed a motion for summary judgment against Deltran, and in the alternative, moved for leave to file a fifth-party complaint against another brass supplier. For the reasons that follow, the Court will deny both Intermatic's and Thyssen's motions for summary judgment, and will grant Thyssen's motion for leave to file a fifth-party complaint.

I. FACTUAL BACKGROUND[2]

After Mr. and Mrs. Dalton purchased their home in the spring of 2006, see Daubert Mot. Ex. B, Donald Dalton Dep. 26:10-24, May 28, 2013, ECF No. 98 [hereinafter Dalton Dep.], Mr. Dalton purchased four Intermatic ML600TW Power Packs ("Power Packs")--devices used to reduce current for low-level exterior lighting, see Daubert Mot. ¶ 5--for Leslie McCourt ("Mr. McCourt") to install. See Dalton Dep. 58:2-8. Without opening the packaging containing the Power Packs or examining their contents, Mr. Dalton simply left them in his basement until Mr. McCourt arrived to install them. Id. 58:13-21.

---

[2] The following undisputed facts are drawn primarily from Mr. Dalton's deposition, which Defendants filed as an exhibit to their recently denied Daubert motion.

Mr. McCourt installed each Power Pack in the basement and connected the wires[3] for the Power Pack that is the subject of the instant litigation, while Mr. Dalton connected the wires to the other three Power Packs. Id. 67:16-68:20. When Mr. Dalton connected the wiring on the three Power Packs he set up, he reviewed the instructions regarding the wattage capacity limits of the Power Packs on the outside of the box that contained the Power Packs, but he did not read any material found inside the box. Id. 81:2-82:9. Until 2012, Mr. Dalton did not experience any issues with the functioning of the Power Packs. Id. 83:14-84:10.

On March 9, 2012, however, Mr. Court was startled by the sound of the smoke alarms going off in his house, and by the discovery of smoke emanating from the basement. Id. 102:10-16, 106:7-107:6. Upon entering the basement, Mr. Dalton observed sparks and flames in the area around the subject Power Pack. Id. 107:14-108:5. Ultimately, the fire "resulted in substantial injury and loss as to the Plaintiffs' real and/or personal property." Am. Compl. ¶ 7, ECF No. 38.

Soon after the incident, Plaintiffs retained the services of Mr. Wald of IEI Consulting, Inc., to determine the cause of the fire. See Daubert Mot. Ex. C, Wald Report [hereinafter Wald Report]. Based on his examination of the site

---

[3] Mr. McCourt connected the wires of the Power Pack to the "up-lights" that shined upon the exterior of the house. See id. 34:17-35:9, 67:21-68:6.

3

on April 6, 2012, Daubert Mot. Ex. D, Michael Wald Dep. 89:5-21, July 22, 2014 [hereinafter Wald Dep.], and on his artifact inspection on May 21, 2012, id. 93:2-95:11, Mr. Wald opined that there "were no other electrical failures which could have caused this fire other than the failure at the load terminal of the timer." Wald Report 1.

In describing why he found said cause "quite clear," Mr. Wald observed that "the section of metal bus that connects one leg of the transformer output to one of the screw terminal connections suffered a prolonged arcing failure." Id. at 2. According to Mr. Wald, "Arcing failures not only generate local temperatures in the 3000-5000 degree Fahrenheit range, they also produce molten metal which can drop onto combustible materials below and ignite a fire. This is what happened in this incident." Id. Mr. Wald laid out his reasoning in greater detail in the following portion of his report:

> The arcing event that occurred only involved one leg of the transformer output. Thus, the cause of this damage is what is known as in-line arcing. In-line arcing occurs when a conductor breaks while current is being drawn through it and electrons jump (arc) from one side of the break to the other. The arc produces plasma and the nearby burning plastics produce carbon. Both of these cause a conductive atmosphere such that the arc can continue, consuming portions of the conductor as it travels. That is why a section of the terminal bus is consumed. This bus broke while the landscape lights were operating and arcing occurred. The possibility that there was a loose connection at the screw terminal that caused this arcing can positively be eliminated since there is no arcing or

4

> even melting at the stranded wiring at the screw terminal. Thus it is concluded that the failure originated in the section of bus below the screw terminal end.
>
> This section of bus is part of the original construction of the timer. There is no evidence that any excessive electrical loads were placed on this bus since all of the downstream wiring and lights were in good operating condition. Therefore it must be concluded that this bus was in a damaged condition when this product was manufactured and sold. The cross sectional area of the bus was so small that the bus separated while only carrying a small load. Some defect in this material must have existed, possibly a crack or a bubble in the metal, or else the metal was damaged during manufacture and assembly by Intermatic, to ultimately result in this internal failure. It is noted that this failure occurred in the area where the bus turns (is bent) 90 degrees from horizontal to vertical which would be a likely place for a crack to form.

Id.

**II.   PROCEDURAL HISTORY**

Plaintiffs filed a complaint on June 25, 2012, asserting the following claims: (1) negligence by Intermatic (Count I); (2) negligence by McCourt (Count II); (3) strict products liability against both Intermatic and McCourt (Count III); (4) breach of implied warranties against Intermatic (Count IV); and (5) breach of implied warranties against McCourt (Count V). Compl. ¶¶ 13-40, ECF No. 1. On March 19, 2013, Magistrate Judge Thomas J. Rueter permitted Plaintiffs to file an amended complaint to add an allegation of interference with enjoyment of real property. ECF No. 37; see also Am. Compl ¶¶ 16, 21, 31, 37,

5

44. On December 5, 2015, however, Plaintiffs stated that "[w]hen [they] proceed to trial in this matter they will be limiting their claims . . . [to] assert a claim only against defendant Intermatic on a claim for strict product liability." Pls.' Mem. Supp. Resp. Mot. Summ. J. 3-4, ECF No. 110 [hereinafter Pl.'s Resp.].[4]

On December 17, 2013, Intermatic filed a third-party complaint, which alleges that Deltran Corp. manufactured a defective component of the Intermatic device that allegedly caused the fire. ECF No. 59.[5] Deltran in turn filed a fourth-party complaint against Thyssen Krupp Materials NA on March 20, 2014, which asserts that liability should shift to Thyssen, as the supplier of the brass used in the allegedly defective component of the Power Pack. ECF No. 75. In response to Deltran's fourth-party complaint, Thyssen filed a motion for summary judgment or, in the alternative, a motion for leave to file a fifth-party complaint against a company named PMX Industries, Inc. ("PMX Industries"). ECF No. 102. In the motion, Thyssen asserts that it was prejudiced by the fact that Deltran

---

[4] As the pages of Plaintiffs' response are not numbered, the Court will refer to the page numbers imposed by ECF.

[5] According to Plaintiffs' expert report, the device that caused the fire was an Intermatic Power Pack, which is a small power source that can be used to power light timers. See Wald Report. Deltran allegedly manufactured the "load terminal" and "load bus" contained in the Power Pack. See Third-Party Compl. ¶¶ 10, 13.

6

failed to provide timely information indicating that PMX Industries may have actually supplied the brass to Deltran.

On November 6, 2014, Intermatic filed a motion for summary judgment, ECF No. 99, as well as a Daubert motion to preclude Plaintiffs' liability expert, Mr. Wald, from testifying, ECF No. 98. Both Deltran and Thyssen joined Intermatic's Daubert motion, ECF Nos. 101, 103, as well as Intermatic's motion for summary judgment, ECF Nos. 100, 105. After a hearing on June 8, 2015, the Court denied the Daubert motion to exclude Plaintiffs' expert witness's testimony at trial. Order dated July 7, 2015, ECF No. 124.

Both Intermatic's and Thyssen's motions for summary judgment are now ripe for disposition.

### III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might

7

affect the outcome of the litigation; a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (internal quotation marks omitted).

**IV. DISCUSSION**

    A.    Intermatic's Motion for Summary Judgment[6]

Conflating the two prongs of Rule 56(a),[7] Defendants assert that "plaintiffs have failed, as a matter of law, to

---

[6] Because, as stated above, all Defendants join Intermatic's motion for summary judgment, the Court will refer to it and its accompanying brief as, respectively, "Defendants' Motion" and "Defendants' Brief" for ease of reference.

[7] Federal Rule of Civil Procedure 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

8

present a genuine issue of material fact . . . as they have failed to establish sufficient facts demonstrating, inter alia, how the Power Pack was defective." Defs.' Br. 11, ECF No. 99. In reaching this conclusion, Defendants argue that under either the Second or Third Restatement of Torts, Plaintiffs' strict liability claim must fail. The Court disagrees.

    1.   The Restatements

In their briefs, the parties spill a significant amount of ink discussing whether this Court, sitting in diversity and applying Pennsylvania strict liability law, should apply either the Second or Third Restatement of Torts. Which restatement the Court will apply will not make a difference, however, given that this case concerns an alleged manufacturing defect--as opposed to a design defect or a failure to warn.

Under the two restatements, the definition of "manufacturing defect" is quite similar, and in practice is functionally identical.

According to the Second Restatement, which was first adopted by the Supreme Court of Pennsylvania in Webb v. Zern, 220 A.2d 853, 854 (Pa. 1966), "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property" may be held strictly liable to the injured party, even if "the seller has exercised all possible care in the preparation and sale of his product." Restatement

9

(Second) of Torts § 402A (1965). "The 402A burden for proving that a product sold was unreasonably dangerous as to the user is met by proving both the defect and the causation." Walton v. Avco Corp., 610 A.2d 454, 458 (Pa. 1992) (internal quotation marks omitted).[8]

Under the Third Restatement--which Defendants assert a district court sitting in diversity should apply per Third Circuit direction, Defs.' Br. 12--a product "contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product." Restatement (Third) of Torts: Products Liability § 2 (1998).

Perhaps misreading the commentary accompanying the

---

[8] While this "unreasonably dangerous" language has wrought substantial jurisprudential mischief, particularly in the context of the risk-utility analysis required to determine if a design is defective, see, e.g., Azzarello v. Black Bros. Co., 391 A.2d 1020, 1026 (Pa. 1978) (rejecting the use of the term "unreasonably dangerous" in jury instructions issued in products liability cases), overruled by Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014), it has not created the same problems with respect to manufacturing defect claims, see Bugosh v. I.U. N. Am., Inc., 971 A.2d 1228, 1234 (Pa. 2009) (Saylor, J., dissenting, joined by Castille, C.J.) ("As the treatment of [the design and warning defect] categories evolved, most courts came to realize that application of strict liability in design and warning cases was far more problematic than in the manufacturing-defect paradigm.")--in part because the determination of whether a single item suffers from a mechanical or compositional defect is more straightforward and less consequential than the socioeconomic calculous that goes into "determin[ing whether] an entire product line is defective," id. at 1235 n.9.

Third Restatement, Defendants discuss concepts of foreseeable risk, alternative design, and adequate warning, Defs.' Br. 12-13--concepts that the Third Restatement's comments only discuss with respect to <u>design</u> and <u>warning</u> defect claims. See Restatement (Third) of Torts: Products Liability § 2 cmts. i, p. Thus, Defendants' assertion that plaintiffs "failed to show that there were any reasonable alternative warnings or instructions that Intermatic could have provided with the Power Pack that would have prevented the misuse of the Power Pack," Defs.' Br. 13, is simply immaterial, given that this is not a design or warning case.

    Moreover, although Defendants cite to a few Third Circuit cases predicting that the Pennsylvania Supreme Court would adopt the Third Restatement's approach to strict liability, <u>see</u> <u>Covell v. Bell Sports, Inc.</u>, 651 F.3d 357 (3d Cir. 2011); <u>Berrier v. Simplicity Mfg., Inc.</u>, 563 F.3d 38 (3d Cir. 2009), those cases involved <u>design</u> and <u>warning</u> defect claims, and not manufacturing defect claims. Also, in the recent case of <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014), the Pennsylvania Supreme Court acknowledged <u>Berrier</u> and its progeny, <u>id.</u> at 375, and explicitly declined to adopt the Third Restatement in the context of design defect cases, <u>id.</u> at 410. Although <u>Tincher</u>'s reaffirmation of the Second Restatement narrowly concerned design cases--potentially leaving unsettled

11

certain issues in Pennsylvania strict liability law, see id. at 409-10--neither the Third Circuit nor the Pennsylvania Supreme Court has indicated that these developments have materially altered the approach courts should take when confronting manufacturing defect claims.

The central issue in the instant case--as framed by the parties and their experts--is whether the fire resulted from a defective metal component of the Power Pack, or whether it resulted from improper installation of the Power Pack. Plaintiffs are not challenging the design of the product, nor are they claiming that the damage was caused by inadequate warnings.

Defendants offer statistical support for their assertion that the product was not "in a defective condition unreasonably dangerous," Restatement (Second) of Torts § 402A, claiming that of the millions of Power Packs manufactured, only a handful of claims have arisen--and all but one involved improper wiring installation. Defs.' Br. 15-16. If this were a design defect case, such information might be more salient, but the design is not at issue. Pointing to statistics of the product's safety does not prove that there was no defect in this Power Pack.

At base, under either the Second or Third Restatement, Plaintiffs need to prove that (1) the Power Pack was defective,

and (2) the defect caused the injury at issue. See Walton, 610 A.2d at 458 (discussing the requirements of § 402A of the Restatement (Second) of Torts); Berrier, 563 F.3d at 53-54 (discussing Restatement (Third) of Torts: Product Liability § 1). Thus, notwithstanding Defendants' assertions to the contrary, Plaintiffs' claims do not fail because Plaintiffs do not provide the sort of socioeconomic risk-utility analysis that is required in design and warning defect cases.

    2.    Misuse of the Product

Discussion of the restatements aside, Defendants' primary contention is that because Plaintiffs did not use the Power Pack as it was intended--but instead installed it contrary to its "FOR OUTSIDE USE ONLY" warning label--Plaintiffs strict liability claim must fail. Again, the argument is misguided.

Defendants cite to a number of cases for the proposition that a defendant can be held strictly liable only when it was unsafe for its intended use when it left the defendant's control. See Commonwealth, Dep't of Gen. Servs. v. U.S. Mineral Prods. Co., 956 A.2d 967, 974 (Pa. 2008); Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co., 898 A.2d 590, 600 (Pa. 2006). Asserting that Plaintiffs misused the Power Pack, Defendants point out that

> [t]he Power Pack was installed indoors, explicitly against the clear instructions and warnings provided by Intermatic. Had the Power Pack been used as

13

>      intended--outdoors--the outcome would not have
>      occurred; any overheating on the part of the loose
>      connection, which resulted in melting and dripping of
>      molten plastics and metals that ignited the material
>      below, could not have ignited a fire because the
>      flammable materials would not have been below it and
>      it would not have been indoors in a contained area.

Defs.' Br. 15. Thus, Defendants conclude that "[h]ad the Power Pack been installed outdoors, as per the warnings and instructions, the fire would not have occurred." Id. at 13.

   As a matter of logic, Defendants simply cannot know that the fire would not have occurred had the Plaintiffs heeded the warning. In fact, under either of the two theories asserted by the parties--whether the cause was a defect in the metal terminal or in the installation of the wiring--it is not out of the realm of possibility, if not likely, that the fire would have occurred had the Power Pack been installed outdoors. Either because of loose wiring or an insufficient cross-sectional area of metal along the terminal, the materials still could have heated and degraded to the point where molten metal and plastic ignited, say, the siding of the house, or dry mulch or leaves near the Power Pack--setting off a fire that could have wrought just as much damage to Plaintiffs' home and personal property as actually occurred.

   This is not to say that the possibility that the fire could have occurred with an outdoor installation would be more or less likely than the possibility that a fire could occur with

the Power Pack installed in the basement. Rather, the point is that, at this stage in the proceedings, there certainly remain genuine disputes of material fact as to whether a defect in the product caused the fire, and as to whether Plaintiffs' indoor use of the product somehow breaks the chain of causation from any defect to the generation of the fire.

And finally, Plaintiffs offer an apt analogy that further illustrates the untenable nature of Defendants' misuse argument:

> A microwave comes with warnings not to use it near a bathtub or sink (due to electrical hazards related to its interaction with the nearby water). Nonetheless, a homeowner brings the microwave into the bathroom to use while his kitchen is being remodeled. If the microwave malfunctions and starts a fire or explodes due to an inherent manufacturing defect of an internal component while it is heating up some leftovers in the bathroom, the microwave manufacturer does not escape otherwise certain liability simply because the microwave was being used in the bathroom. It was being employed for its intended use (heating up food) and the owner's alleged misuse or negligence (use in a bathroom) was not a causative element of the fire.

Pls.' Resp. 3 n. 2. As with the microwave example, the question is not simply whether there was a misuse of the product,[9] but whether the alleged misuse (in installing the Power Pack indoors, in violation of the product's warning label) was

---

[9] Notably, although Plaintiffs may not have installed the Power Pack in its intended location, they surely employed it for its intended use: to distribute power to a lighting system.

15

causally connected to the onset of the fire.[10]

Viewing the facts in the light most favorable to the nonmoving Plaintiffs, Pignataro, 593 F.3d at 268, the Court finds that Defendants have failed to show that Plaintiffs' strict liability claim fails as a matter of law, and Plaintiffs have sufficiently "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (internal quotation marks omitted). Accordingly, the Court will deny Defendants' Motion for Summary Judgment.

B. Thyssen's Motion for Summary Judgment

In the fourth-party complaint it filed on March 20, 2014, Deltran alleges that to the extent that there was a defect in the terminal of the Power Pack, Thyssen should be responsible for it as the supplier of the brass for the component. See Fourth-Party Compl. ¶¶ 20-21. In Thyssen's Motion for Summary Judgment, however, Thyssen alleges that "Deltran provided no information regarding the brass for the subject load bus or any other load bus until October 22, 2014, well [after] fact

---

[10] See Kuisis v. Baldwin-Lima-Hamilton Corp., 319 A.2d 914, 920 (Pa. 1974) ("When a malfunction occurs, a concurrent abnormal use of the machine forecloses an inference of a defective condition only if the abnormal use itself contributed to the malfunction.").

discovery had ended." Thyssen's Br. 15, ECF No. 102.[11] Thyssen further argues that the three invoices provided on October 22, 2014, are "insufficient" to show that Thyssen supplied the brass, since they indicate that Deltran used other brass suppliers as well during the relevant time period. Id. Since the evidence does not show that Thyssen was responsible for the allegedly defective product, Thyssen argues that Deltran's fourth-party complaint must be dismissed.

In its response, Deltran remarks that

> [d]espite entering an appearance on May 20, 2014, ThyssenKrupp never served discovery on Deltran Corp. In October 2014, well after the discovery deadline, ThyssenKrupp made an inquiry to Deltran Corp. regarding documents that ThyssenKrupp supplied the subject brass at issue. On October 22, 2014, Deltran Corp. forwarded documents to ThyssenKrupp evidencing that ThyssenKrupp supplied the subject brass at issue. ThyssenKrupp now seeks dismissal of the Fourth Party Complaint or in the alternative leave to file a Fi[f]th Party Complaint because they failed to timely or otherwise serve discovery.

Deltran's Mem. Resp. Thyssen's Mot. Summ. J. 2, ECF No. 106 [hereinafter Deltran's Resp.].[12] Thus, other than a single belated request for information, Thyssen apparently elected to not participate in the discovery process--and Thyssen has not

---

[11] As the pages of Thyssen's memorandum in support of its motion for summary judgment are not numbered, the Court will refer to the page numbers imposed by ECF.

[12] As the pages of Deltran's response to Thyssen's motion for summary judgment are not numbered, the Court will refer to the page numbers imposed by ECF.

disputed Deltran's characterization of these events.

Deltran also contends that "ThyssenKrupp is mistaken that the three invoices are the only evidence regarding the ThyssenKrupp brass sales." Id. at 4. Rather, Deltran asserts that other evidence, including the testimony of Deltran corporate designees at trial, links the Thyssen brass sale to the Power Pack at issue.

The Court concludes that, as observed by Deltran, "[c]ertainly there are genuine issues of material fact, which must be resolved by a trier of fact." Id. Viewing the facts in the light most favorable to the nonmoving party, Pignataro, 593 F.3d at 268, and finding that Deltran has adequately "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 250 (internal quotation marks omitted), the Court will deny Thyssen's Motion for Summary Judgment.

C.   Thyssen's Motion to File a Fifth-Party Complaint

Should the Court deny its Motion for Summary Judgment, Thyssen moves that the Court permit it to file a fifth-party complaint against PMX Industries.

Pursuant to the Federal Rule of Civil Procedure 14, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it," but must obtain leave of court if more than fourteen days have passed since the

party served its original answer. See Fed. R. Civ. P. 14(a)(1).

Here, Thyssen seeks leave to file a fifth-party complaint against PMX Industries--another brass supplier listed in the invoices Deltran provided Thyssen on October 22, 2014. Thyssen claims that it "was unable to determine which supplier it received the subject brass from until Deltran provided its purchase orders. This was the first time that PMX Industries' potential liability became apparent. ThyssenKrupp was unable to file a Fifth Party Complaint against PMX until now." Thyssen's Br. 17.

Just as Plaintiff did not oppose Intermatic's motion for leave of Court to file a third-party complaint against Deltran, and just as the Plaintiff and Intermatic did not oppose Deltran's motion for leave to file a fourth-party complaint against Thyssen, Deltran does not oppose Thyssen's motion for leave to file a fifth-party complaint. Deltran's Resp. 5. Accordingly, the Court will grant Thyssen's motion for leave to file a fifth-party complaint against PMX Industries.

V.   CONCLUSION

For the foregoing reasons, the Court will deny both Intermatic's[13] and Thyssen's motions for summary judgment, and

---

[13] The Court will also deny Deltran and Thyssen's motions for summary judgment that simply join Intermatic's motion.

will grant Thyssen's motion for leave to file a fifth-party complaint. An appropriate order follows.